GRIFFIN ET AL. *v.* BRECKENRIDGE ET AL.

No. 144. Argued January 13–14, 1971—Decided June 7, 1971.

STEWART, J., delivered the opinion of the Court, in which BURGER; C. J., and BLACK, DOUGLAS, HARLAN (except for Part V-B), BRENNAN; WHITE, MARSHALL, and BLACKMUN, JJ., joined. HARLAN, J., filed a concurring statement, *post,* p. 107.

*Stephen J. Pollak* argued the cause for petitioners. With him on the brief were *Gary J. Greenberg* and *John A. Bleveans.*

*W. D. Moore,* by appointment of the Court, 400 U. S. 1006, argued the cause for respondents. With him on the brief was *Helen J. McDade.*

*Lawrence G. Wallace* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Griswold* and *Louis F. Claiborne.*

MR. JUSTICE STEWART delivered the opinion of the Court.

This litigation began when the petitioners filed a complaint in the United States District Court for the Southern District of Mississippi, seeking compensatory and punitive damages and alleging, in substantial part, as follows:

"2. The plaintiffs are Negro citizens of the United States and residents of Kemper County, Mississippi. . . .

"3. The defendants, Lavon Breckenridge and James Calvin Breckenridge, are white adult citizens of the United States residing in DeKalb, Kemper County, Mississippi.

"4. On July 2, 1966, the . . . plaintiffs . . . were passengers in an automobile belonging to and operated by R. G. Grady of Memphis, Tennessee. They were travelling upon the federal, state and local highways in and about DeKalb, Mississippi, performing various errands and visiting friends.

"5. On July 2, 1966 defendants, acting under a mistaken belief that R. G. Grady was a worker for Civil Rights for Negroes, wilfully and maliciously conspired, planned, and agreed to block the passage of said plaintiffs in said automobile upon the public highways, to stop and detain them and to assault, beat and injure them with deadly weapons. Their purpose was to prevent said plaintiffs and other Negro-Americans, through such force, violence and intimidation, from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Mississippi, including but not limited to their rights to freedom of speech, movement, association and assembly; their right to petition their government for redress of their grievances; their rights to be secure in their persons and their homes; and their rights not to be enslaved nor deprived of life and liberty other than by due process of law.

"6. Pursuant to their conspiracy, defendants drove their truck into the path of Grady's automobile and blocked its passage over the public road. Both defendants then forced Grady and said plaintiffs to get out of Grady's automobile and prevented said plaintiffs from escaping while defendant James

Calvin Breckenridge clubbed Grady with a blackjack, pipe or other kind of club by pointing firearms at said plaintiffs and uttering threats to kill and injure them if defendants' orders were not obeyed, thereby terrorizing them to the utmost degree and depriving them of their liberty.

"7. Pursuant to their conspiracy, defendants wilfully, intentionally, and maliciously menaced and assaulted each of the said plaintiffs by pointing firearms and wielding deadly blackjacks, pipes or other kind of clubs, while uttering threats to kill and injure said plaintiffs, causing them to become stricken with fear of immediate injury and death and to suffer extreme terror, mental anguish and emotional and physical distress.

"8. Pursuant to defendants' conspiracy, defendant James Calvin Breckenridge then wilfully, intentionally and maliciously clubbed each of said plaintiffs on and about the head, severely injuring all of them, while both defendants continued to assault said plaintiffs and prevent their escape by pointing their firearms at them.

"12. By their conspiracy and acts pursuant thereto, the defendants have wilfully and maliciously, directly and indirectly, intimidated and prevented the . . . plaintiffs . . . and other Negro-Americans from enjoying and exercising their rights, privileges and immunities as citizens of the United States and the State of Mississippi, including but not limited to, their rights to freedom of speech, movement, association and assembly; the right to petition their government for redress of grievances; their right to be secure in their person; their right not to be enslaved nor deprived of life, liberty or property other than by due process of law, and their

rights to travel the public highways without restraint in the same terms as white citizens in Kemper County, Mississippi . . . ."

The jurisdiction of the federal court was invoked under the language of Rev. Stat. § 1980, 42 U. S. C. § 1985 (3), which provides:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

The District Court dismissed the complaint for failure to state a cause of action, relying on the authority of this Court's opinion in *Collins* v. *Hardyman,* 341 U. S. 651, which in effect construed the above language of § 1985 (3) as reaching only conspiracies under color of state law. The Court of Appeals for the Fifth Circuit affirmed the judgment of dismissal. 410 F. 2d 817. Judge Goldberg's thorough opinion for that court expressed "serious doubts" as to the "continued vitality" of *Collins* v. *Hardyman, id.,* at 823, and stated that "it would not surprise us if Collins v. Hardyman were disapproved and if § 1985 (3) were held to embrace private conspiracies to interfere with rights of national citizenship," *id.,* at 825–826 (footnote omitted), but concluded that "[s]ince we

may not adopt what the Supreme Court has expressly rejected, we obediently abide the mandate in *Collins,*" *id.,* at 826–827. We granted certiorari, 397 U. S. 1074, to consider questions going to the scope and constitutionality of 42 U. S. C. § 1985 (3).

## I

*Collins* v. *Hardyman* was decided 20 years ago. The complaint in that case alleged that the plaintiffs were members of a political club that had scheduled a meeting to adopt a resolution opposing the Marshall Plan, and to send copies of the resolution to appropriate federal officials; that the defendants conspired to deprive the plaintiffs of their rights as citizens of the United States peaceably to assemble and to equal privileges and immunities under the laws of the United States; that, in furtherance of the conspiracy, the defendants proceeded to the meeting site and, by threats and violence, broke up the meeting, thus interfering with the right of the plaintiffs to petition the Government for the redress of grievances; and that the defendants did not interfere or conspire to interfere with the meetings of other political groups with whose opinions the defendants agreed. The Court held that this complaint did not state a cause of action under § 1985 (3): [1]

"The complaint makes no claim that the conspiracy or the overt acts involved any action by state officials, or that defendants even pretended to act under color of state law. It is not shown that defendants had or claimed any protection or immunity from the law of the State, or that they in fact enjoyed such because of any act or omission by state authorities." 341 U. S., at 655.

"What we have here is not a conspiracy to affect in any way these plaintiffs' equality of protection by

---

[1] The statute was then 8 U. S. C. § 47 (3) (1946 ed.).

the law, or their equality of privileges and immunities under the law. There is not the slightest allegation that defendants were conscious of or trying to influence the law, or were endeavoring to obstruct or interfere with it. . . . Such private discrimination is not inequality before the law unless there is some manipulation of the law or its agencies to give sanction or sanctuary for doing so." *Id.,* at 661.

The Court was careful to make clear that it was deciding no constitutional question, but simply construing the language of the statute, or more precisely, determining the applicability of the statute to the facts alleged in the complaint: [2]

"We say nothing of the power of Congress to authorize such civil actions as respondents have commenced or otherwise to redress such grievances as they assert. We think that Congress has not, in the narrow class of conspiracies defined by this statute, included the conspiracy charged here. We therefore reach no constitutional questions." *Id.,* at 662.

Nonetheless, the Court made equally clear that the construction it gave to the statute was influenced by the constitutional problems that it thought would have otherwise been engendered:

"It is apparent that, if this complaint meets the requirements of this Act, it raises constitutional problems of the first magnitude that, in the light of history, are not without difficulty. These would

---

[2] "We do not say that no conspiracy by private individuals could be of such magnitude and effect as to work a deprivation of equal protection of the laws, or of equal privileges and immunities under laws. . . . But here nothing of that sort appears. We have a case of a lawless political brawl, precipitated by a handful of white citizens against other white citizens." 341 U. S., at 662.

include issues as to congressional power under and apart from the Fourteenth Amendment, the reserved power of the States, the content of rights derived from national as distinguished from state citizenship, and the question of separability of the Act in its application to those two classes of rights." *Id.*, at 659.

Mr. Justice Burton filed a dissenting opinion, joined by MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS. The dissenters thought that "[t]he language of the statute refutes the suggestion that action under color of state law is a necessary ingredient of the cause of action which it recognizes." *Id.*, at 663. Further, the dissenters found no constitutional difficulty in according to the statutory words their apparent meaning:

"Congress certainly has the power to create a federal cause of action in favor of persons injured by private individuals through the abridgment of federally created constitutional rights. It seems to me that Congress has done just this in [§ 1985 (3)]. This is not inconsistent with the principle underlying the Fourteenth Amendment. That amendment prohibits the respective states from making laws abridging the privileges or immunities of citizens of the United States or denying to any person within the jurisdiction of a state the equal protection of the laws. Cases holding that those clauses are directed only at state action are not authority for the contention that Congress may not pass laws supporting rights which exist apart from the Fourteenth Amendment." *Id.*, at 664.

## II

Whether or not *Collins* v. *Hardyman* was correctly decided on its own facts is a question with which we need not here be concerned. But it is clear, in the light of

the evolution of decisional law in the years that have passed since that case was decided, that many of the constitutional problems there perceived simply do not exist. Little reason remains, therefore, not to accord to the words of the statute their apparent meaning. That meaning is confirmed by judicial construction of related laws, by the structural setting of § 1985 (3) itself, and by its legislative history. And a fair reading of the allegations of the complaint in this case clearly brings them within this meaning of the statutory language. As so construed, and as applied to this complaint, we have no doubt that the statute was within the constitutional power of Congress to enact.

### III

We turn, then, to an examination of the meaning of § 1985 (3). On their face, the words of the statute fully encompass the conduct of private persons. The provision speaks simply of "two or more persons in any State or Territory" who "conspire or go in disguise on the highway or on the premises of another." Going in disguise, in particular, is in this context an activity so little associated with official action and so commonly connected with private marauders that this clause could almost never be applicable under the artificially restrictive construction of *Collins*. And since the "going in disguise" aspect must include private action, it is hard to see how the conspiracy aspect, joined by a disjunctive, could be read to require the involvement of state officers.

The provision continues, specifying the motivation required "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." This language is, of course, similar to that of § 1 of the Fourteenth Amend-

ment, which in terms speaks only to the States,[3] and judicial thinking about what can constitute an equal protection deprivation has, because of the Amendment's wording, focused almost entirely upon identifying the requisite "state action" and defining the offending forms of state law and official conduct. A century of Fourteenth Amendment adjudication has, in other words, made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State. See, *e. g.*, *United States v. Harris*, 106 U. S. 629, 643. Indeed, the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985 (3) of *all* deprivations of "equal protection of the laws" and "equal privileges and immunities under the laws," whatever their source.

The approach of this Court to other Reconstruction civil rights statutes in the years since *Collins* has been to "accord [them] a sweep as broad as [their] language." *United States v. Price*, 383 U. S. 787, 801; *Jones v. Alfred H. Mayer Co.*, 392 U. S. 409, 437. Moreover, very similar language in closely related statutes has early and late received an interpretation quite inconsistent with that given to § 1985 (3) in *Collins.* In construing the exact criminal counterpart of § 1985 (3), the Court in *United States v. Harris, supra,* observed that the statute was "not limited to take effect only in case [of state action]," *id.;* at 639, but "was framed to protect from invasion by private persons, the equal privileges

---

[3] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

and immunities under the laws, of all persons and classes of persons," *id.*, at 637. In *United States* v. *Williams,* 341 U. S. 70, the Court considered the closest remaining criminal analogue to § 1985 (3), 18 U. S. C. § 241.[4] Mr. Justice Frankfurter's plurality opinion, without contravention from the concurrence or dissent, concluded that "if language is to carry any meaning at all it must be clear that the principal purpose of [§ 241], unlike [18 U. S. C. § 242], was to reach private action rather than officers of a State acting under its authority. Men who 'go in disguise upon the public highway, or upon the premises of another' are not likely to be acting in official capacities." 341 U. S., at 76. "Nothing in [the] terms [of § 241] indicates that color of State law was to be relevant to prosecution under it." *Id.*, at 78 (footnote omitted).

A like construction of § 1985 (3) is reinforced when examination is broadened to take in its companion statutory provisions. There appear to be three possible forms for a state action limitation on § 1985 (3)—that there must be action under color of state law, that there must be interference with or influence upon state authorities, or that there must be a private conspiracy so massive and effective that it supplants those authorities and thus satisfies the state action requirement.[5] The Congress

---

[4] "If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

The penalty section was amended in 1968. See 18 U. S. C. § 241 (1964 ed., Supp. V).

[5] This last was suggested in *Collins* v. *Hardyman.* See n. 2, *supra.*

that passed the Civil Rights Act of 1871, 17 Stat. 13, § 2 of which is the parent of § 1985 (3), dealt with each of these three situations in explicit terms in other parts of the same Act. An element of the cause of action established by the first section, now 42 U. S. C. § 1983, is that the deprivation complained of must have been inflicted under color of state law.[6] To read any such requirement into § 1985 (3) would thus deprive that section of all independent effect. As for interference with state officials, § 1985 (3) itself contains another clause dealing explicitly with that situation.[7] And § 3 of the 1871 Act provided for military action at the command of the President should massive private lawlessness render state authorities powerless to protect the federal rights of classes of citizens, such a situation being defined by the Act as constituting a state denial of equal protection. 17 Stat. 14. Given the existence of these three provisions, it is almost impossible to believe that Congress intended, in the dissimilar language of the portion of § 1985 (3) now before us, simply to duplicate the coverage of one or more of them.

The final area of inquiry into the meaning of § 1985 (3) lies in its legislative history. As originally introduced in the 42d Congress, the section was solely a criminal provision outlawing certain conspiratorial acts done with

---

[6] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[7] "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another . . . for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . ."

intent "to do any act in violation of the rights, privileges, or immunities of another person . . . ." Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871). Introducing the bill, the House sponsor, Representative Shellabarger, stressed that "the United States always has assumed to enforce, as against the States, *and also persons*, every one of the provisions of the Constitution." *Id.*, at App. 69 (emphasis supplied). The enormous sweep of the original language led to pressures for amendment, in the course of which the present civil remedy was added. The explanations of the added language centered entirely on the animus or motivation that would be required, and there was no suggestion whatever that liability would not be imposed for purely private conspiracies. Representative Willard, draftsman of the limiting amendment, said that his version "provid[ed] that the essence of the crime should consist in the intent to deprive a person of the equal protection of the laws and of equal privileges and immunities under the laws; in other words, that the Constitution secured, and was only intended to secure, equality of rights and immunities, and that we could only punish by United States laws a denial of that equality." *Id.*, at App. 188. Representative Shellabarger's explanation of the amendment was very similar: "The object of the amendment is . . . to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section." *Id.*, at 478.[8]

---

[8] The conspiracy and disguise language of what finally became § 1985 (3) appears to have been borrowed from the parent of 18 U. S. C. § 241. See Cong. Globe, 41st Cong., 2d Sess., 3611–3613 (1870).

Other supporters of the bill were even more explicit in their insistence upon coverage of private action. Shortly before the amendment was introduced, Representative Shanks urged, "I do not want to see [this measure] so amended that there shall be taken out of it the frank assertion of the power of the national Government to protect life, liberty, and property, irrespective of the act of the State." *Id.*, at App. 141. At about the same time, Representative Coburn asked: "Shall we deal with individuals, or with the State as a State? If we can deal with individuals, that is a less radical course, and works less interference with local governments. . . . It would seem more accordant with reason that the easier, more direct, and more certain method of dealing with individual criminals was preferable, and that the more thorough method of superseding State authority should only be resorted to when the deprivation of rights and the condition of outlawry was so general as to prevail in all quarters in defiance of or by permission of the local government." *Id.*, at 459. After the amendment had been proposed in the House, Senator Pool insisted in support of the bill during Senate debate that "Congress must deal with individuals, not States. It must punish the offender against the rights of the citizen . . . ." *Id.*, at 608.

It is thus evident that all indicators—text, companion provisions, and legislative history—point unwaveringly to § 1985 (3)'s coverage of private conspiracies. That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others. For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook, "that Congress has a right to punish an assault and battery when committed by two or more per-

sons within a State." *Id.,* at 485. The constitutional shoals that would lie in the path of interpreting § 1985 (3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger, quoted *supra,* at 100. The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps other-wise class-based, invidiously discriminatory animus behind the conspirators' action.[9] The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.[10]

## IV

We return to the petitioners' complaint to determine whether it states a cause of action under § 1985 (3) as so construed. To come within the legislation a complaint must allege that the defendants did (1) "conspire or go in disguise on the highway or on the premises of another" (2) "for the purpose of depriving, either directly

---

[9] We need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985 (3) before us. Cf. Cong. Globe, 42d Cong., 1st Sess., 567 (1871) (remarks of Sen. Edmunds):

[10] The motivation requirement introduced by the word "equal" into the portion of § 1985 (3) before us must not be confused with the test of "specific intent to deprive a person of a federal right made definite by decision or other rule of law" articulated by the plurality opinion in *Screws* v. *United States,* 325 U. S. 91, 103, for prosecutions under 18 U. S. C. § 242. Section 1985 (3), unlike § 242, contains no specific requirement of "wilfulness." Cf. *Monroe* v. *Pape,* 365 U. S. 167, 187. The motivation aspect of § 1985 (3) focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus.

or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

The complaint fully alleges, with particulars, that the respondents conspired to carry out the assault. It further asserts that "[t]heir purpose was to prevent [the] plaintiffs and other Negro-Americans, through . . . force, violence and intimidation, from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Mississippi," including a long list of enumerated rights such as free speech, assembly, association, and movement. The complaint further alleges that the respondents were "acting under a mistaken belief that R. G. Grady was a worker for Civil Rights for Negroes." These allegations clearly support the requisite animus to deprive the petitioners of the equal enjoyment of legal rights because of their race. The claims of detention, threats, and battery amply satisfy the requirement of acts done in furtherance of the conspiracy. Finally, the petitioners—whether or not the nonparty Grady was the main or only target of the conspiracy—allege personal injury resulting from those acts. The complaint, then, states a cause of action under § 1985 (3). Indeed, the conduct here alleged lies so close to the core of the coverage intended by Congress that it is hard to conceive of wholly private conduct that would come within the statute if this does not. We must, accordingly, consider whether Congress had constitutional power to enact a statute that imposes liability under federal law for the conduct alleged in this complaint.

## V

The constitutionality of § 1985 (3) might once have appeared to have been settled adversely by *United States* v. *Harris,* 106 U. S. 629, and *Baldwin* v. *Franks,* 120 U. S. 678, which held unconstitutional its criminal counterpart, then § 5519 of the Revised Statutes.[11]  The Court in those cases, however, followed a severability rule that required invalidation of an entire statute if any part of it was unconstitutionally overbroad, unless its different parts could be read as wholly independent provisions. *E. g., Baldwin* v. *Franks, supra,* at 685.  This Court has long since firmly rejected that rule in such cases as *United States* v. *Raines,* 362 U. S. 17, 20–24.  Consequently, we need not find the language of § 1985 (3) now before us constitutional in all its possible applications in order to uphold its facial constitutionality and its application to the complaint in this case.

That § 1985 (3) reaches private conspiracies to deprive others of legal rights can, of itself, cause no doubts of its constitutionality.  It has long been settled that 18 U. S. C. § 241, a criminal statute of far broader phrasing (see n. 4, *supra*), reaches wholly private conspiracies and is constitutional.  *E. g., In re Quarles,* 158 U. S. 532; *Logan* v. *United States,* 144 U. S. 263, 293–295; *United States* v. *Waddell,* 112 U. S. 76, 77–81; *Ex parte Yarbrough,* 110 U. S. 651.  See generally *Twining* v. *New Jersey,* 211 U. S. 78, 97–98.  Our inquiry, therefore, need go only to identifying a source of congressional power to reach the private conspiracy alleged by the complaint in this case.

## A

Even as it struck down Rev. Stat. § 5519 in *United States* v. *Harris,* the Court indicated that parts of its coverage would, if severable, be constitutional under the

---

[11] Rev. Stat. § 5519 was repealed in 1909.  35 Stat. 1154.

Thirteenth Amendment. 106 U. S., at 640–641. And surely there has never been any doubt of the power of Congress to impose liability on private persons under § 2 of that amendment, "for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights Cases,* 109 U. S. 3, 20. See also *id.,* at 23; *Clyatt* v. *United States,* 197 U. S. 207, 216, 218; *Jones* v. *Alfred H. Mayer Co.,* 392 U. S., at 437–440. Not only may Congress impose such liability, but the varieties of private conduct that it may make criminally punishable or civilly remediable extend far beyond the actual imposition of slavery or involuntary servitude. By the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free. To keep that promise, "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Jones* v. *Alfred H. Mayer Co., supra,* at 440. We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men.

B

Our cases have firmly established that the right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private as well as governmental interference. *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631; *id.,* at 642–644 (concurring opinion); *United States*

v. *Guest*, 383 U. S. 745, 757–760 and n. 17; *Twining* v. *New Jersey*, 211 U. S. 78, 97; *Slaughter-House Cases*, 16 Wall. 36, 79–80; *Crandall* v. *Nevada*, 6 Wall. 35, 44, 48–49; *Passenger Cases*, 7 How. 283, 492 (Taney, C. J., dissenting). The "right to pass freely from State to State" has been explicitly recognized as "among the rights and privileges of National citizenship." *Twining* v. *New Jersey, supra,* at 97. That right, like other rights of national citizenship, is within the power of Congress to protect by appropriate legislation. *E. g., United States* v. *Guest, supra,* at 759; *United States* v. *Classic,* 313 U. S. 299, 314–315; *Ex parte Yarbrough,* 110 U. S. 651; *Oregon* v. *Mitchell,* 400 U. S. 112, 285–287 (concurring and dissenting opinion).

The complaint in this case alleged that the petitioners "were travelling upon the federal, state and local highways in and about" DeKalb, Kemper County, Mississippi. Kemper County is on the Mississippi-Alabama border. One of the results of the conspiracy, according to the complaint, was to prevent the petitioners and other Negroes from exercising their "rights to travel the public highways without restraint in the same terms as white citizens in Kemper County, Mississippi." Finally, the conspiracy was alleged to have been inspired by the respondents' erroneous belief that Grady, a Tennessean, was a worker for Negro civil rights. Under these allegations it is open to the petitioners to prove at trial that they had been engaging in interstate travel or intended to do so, that their federal right to travel interstate was one of the rights meant to be discriminatorily impaired by the conspiracy, that the conspirators intended to drive out-of-state civil rights workers from the State, or that they meant to deter the petitioners from associating with such persons. This and other evidence could make it clear that the petitioners had suffered from conduct that Congress may reach under its power to protect the right of interstate travel.

## C

In identifying these two constitutional sources of congressional power, we do not imply the absence of any other. More specifically, the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment.[12] By the same token, since the allegations of the complaint bring this cause of action so close to the constitutionally authorized core of the statute, there has been no occasion here to trace out its constitutionally permissible periphery.

The judgment is reversed, and the case is remanded to the United States District Court for the Southern District of Mississippi for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN, concurring.

I agree with the Court's opinion, except that I find it unnecessary to rely on the "right of interstate travel" as a premise for justifying federal jurisdiction under § 1985 (3). With that reservation, I join the opinion and judgment of the Court.

---

[12] See *Katzenbach* v. *Morgan,* 384 U. S. 641; *Oregon* v. *Mitchell,* 400 U. S. 112, 135 (opinion of DOUGLAS, J.), 229 (opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *United States* v. *Guest,* 383 U. S. 745, 761 (Clark, J., concurring), 774 (BRENNAN, J., concurring and dissenting).