Robert J. BAKER, Plaintiff,

v.

McDONALD'S CORPORATION, Defendant.

No. 83–6313–Civ.

United States District Court, S.D. Florida.

Dec. 4, 1987.

William N. Hutchison, Jr., Fort Lauderdale, Fla., for plaintiff.

Jeffrey McClellan, Atlanta, Ga., for defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAINE, District Judge.

This cause is before the Court upon the defendant McDONALD's CORPORATION's (hereafter referred to as McDONALD's)[1] motion for summary judgment pursuant to *Federal Rule of Civil Procedure* 56. The only response to this motion made on behalf of the plaintiff is an unfiled, undocketed, affidavit, dated June 4, 1984, which is located on the left-hand side of the Court file (Volume II) (i.e., separate from the pleadings and documents which are an official part of the court record).[2] No memorandum in opposition to the motion for summary judgment (D.E. 25) was filed by plaintiff's counsel.[3]

The plaintiff brought this action against McDONALDS and several individual employees of McDONALDS alleging violations of the Thirteenth and Fourteenth Amendments to the U.S. Constitution, and

---

1. McDONALDs is the only remaining defendant in this action, as all other defendants were dismissed pursuant to court order (D.E. 59) for the plaintiff's failure to timely serve them.

2. In our order dated February 7, 1986 (D.E. 58) we noted that this affidavit had been "filed". Such was not the case. There is nothing to indicate who placed this affidavit in the court file, or when it was placed in the court file. We further note that every document received by this office is stamped with the word "received" and the date. Likewise, in the Clerk's office, documents received by mail or hand-delivered are either "filed" (i.e., the word "filed", the date, the time and the place of filing are all stamped on the document) or stamped "received," with the date. No such stamps appear on the affidavit in the file.

3. The plaintiff requested an extension of time to file a response to the motion for summary judgment (D.E. 33). This request was granted and the plaintiff was allowed until May 30, 1984 to

violations of 42 U.S.C. §§ 1981, 1983 [4], 1985 and 2000e. Specifically, the plaintiff claims that he was the victim of racial and sex discrimination; he seeks declaratory and injunctive relief, as well as damages.

After a review of the record before us, including the plaintiff's deposition (consisting of three (3) volumes), affidavits submitted by the defendant, relevant pleadings and memoranda, and plaintiff's unfiled affidavit, we find that there is no genuine issue of material fact which remains to be decided and that the defendant is entitled to judgment as a matter of law. In accordance therewith, we make the following findings of fact and conclusions of law.

### Findings of Fact

The plaintiff is a black male. He was initially hired by McDONALDS CORP. on August 1, 1976 as a manager trainee [Plaintiff's Deposition, Volume I, p. 76 (D.E. 56)]. He was assigned to work at one of the company's Ft. Lauderdale stores. After three weeks, he was promoted to second assistant manager [Plaintiff's deposition, Volume I, p. 83]. Thereafter, plaintiff's advancement was rapid—the plaintiff admits that he progressed upwards through the company ranks at a faster-than-normal pace [Plaintiff's deposition; Volume I p. 96].[5]

In approximately February, 1981, plaintiff became an area supervisor [Plaintiff's deposition; Volume I, p. 110]. As area supervisor, plaintiff was responsible for the overall supervision of four to five stores in Broward and/or Dade Counties [Plaintiff's deposition, Volume I, p. 111].

As part of his work responsibilities, plaintiff was required to evaluate the store managers at each store within his jurisdiction, as well as help resolve personnel problems within each store [Plaintiff's deposition, Volume I; pp. 111–112; pp. 197–201].[6] In addition, plaintiff understood that his duties included the prevention and elimination of racial and sex discrimination within the workplace [Plaintiff's deposition, Volume II; pp. 50–54].

As part of his training, Baker received instruction in personnel, labor and human relations [Plaintiff's deposition, Volume I; pp. 113–116]. In late 1981, sexual harassment was discussed in one of these courses. At one point during a group discussion, it was stated that merely touching a female employee could be interpreted as sexual harassment [Plaintiff's deposition, Volume I; p. 116].[7]

During plaintiff's employment, Mc-DONALDS maintained the following policy:

### Non–Discrimination at McDonald's

It is McDonald's policy to treat employees and applicants for employment fairly and without regard to race, color, sex, religion, national origin, age or

---

file his response (D.E. 37). No response was ever filed.

4. Plaintiff states during his deposition that the inclusion of § 1983 in the complaint was a typographical error [Plaintiff's deposition, Volume II, p. 33]. However, no amendment to the complaint, or other formal notice that its inclusion was in error, was ever filed. Moreover, certain allegations in plaintiff's unfiled affidavit (¶ 15 and ¶ 16) show an intent to pursue a § 1983 claim, since those allegations have no relevance whatsoever *except* in connection with a § 1983 claim.

5. For a detailed description of plaintiff's employment progress, see Plaintiff's deposition, Volume I; pp. 87–89, 91, 94, 97–99, and 105–110.

6. Plaintiff testified that he made an annual performance review of each manager on a specified point scale—i.e. from 1 to 5, 5 being the lowest evaluation. Upon being asked what the lowest evaluation he ever gave was, he replied that it was a 3, to Joe Kopezza [Plaintiff's deposition, Volume I; pp. 195–196, 198, 200]. He did make one evaluation in 1982 to Marie Sakelos, however, he did not remember what evaluation he had given her [pp. 197–198] and stated that he never told her what her evaluation had been.

7. Plaintiff states that Larry Zimmerman, the regional supervisor at that time, made the following comments about a Mr. Fred Collins, who was plaintiff's supervisor:
 "[He said] that McDonald's sexual harassment was becoming more and more evident, and he used Fred Collins in the group; that Fred's a toucher, and that could be interpreted as a sexual harassment."
 [Plaintiff's deposition, Volume I; p. 116].

handicap. This policy applies to all employment practices including recruiting, hiring, pay rates, promotions, and other terms and conditions of employment and terminations. McDonald's also prohibits any form of harassment, joking remarks or other abusive conduct directed at employees because of their race, color, sex, religion, national origin, or handicap. Any employee who feels subjected to such behavior should immediately report it to their supervisor, their supervisor's supervisor, or Personnel Manager. Such reports will be investigated thoroughly. If the report has merit, disciplinary action will be taken against the offender. Depending on the severity of the misconduct, the disciplinary action could range from a warning to termination.

[D.E. 25; Attachment to Affidavit of Jamie Measey].

Although plaintiff claims that he had never seen a copy of the written policy statement [Plaintiff's deposition, Volume I; pp. 117–118], he had some "common sense" understanding of what would constitute unacceptable behavior [Plaintiff's deposition, Volume I; pp. 122–124, 149; Volume II; pp. 50–54]. For instance, on at least one occasion, Baker reprimanded several male employees for making alleged suggestive remarks to a female employee [Plaintiff's deposition, Volume I; pp. 123–124].

In March, 1982, two female employees who were under Baker's supervision complained to Jamie Measey, the assistant Personnel Manager, that the plaintiff had made sexual advances toward them [D.E. 25; Affidavit of Jamie Measey]. The affidavits of those employees, attached to the motion for summary judgment, describe attempts by the plaintiff to establish an intimate relationship with each woman.

Beverly Froeba, a swing manager under plaintiff's supervision, relates an incident which occurred in March, 1982. After making repeated remarks over a period of months to Mrs. Froeba that he wished to "get together" with her,[8] Baker approached Mrs. Froeba and invited her out for a drink. Mrs. Froeba accepted after Baker told her that two other employees would be joining them. She and Baker went to a restaurant, where Baker again repeated his remark that he wished to "get together" with her. He added that "his wife didn't always give him everything he wanted and that sometimes he wanted something different." [D.E. 25; Attachment 2]. When the other employees did not appear, Mrs. Froeba requested that they leave the restaurant, and they did so.

Jean Acierno, a store manager under Baker's supervision, states that Baker had invited her out for drinks frequently. One evening in February, 1982, Baker called her on the telephone, at home, insisting that he needed to see her about an urgent matter. In the face of his insistence, she finally capitulated, and stated that since she could not leave her children alone, he should come to her house.

Upon arrival, Baker stated his business—to Ms. Acierno, his "urgent" matter seemed somewhat trivial. Ms. Acierno states that, once the matter had been discussed and disposed of, Baker began talking about his marital problems. He informed Ms. Acierno that he dated other women and then said "Jean, I want you." Ms. Acierno replied that he could not have her, at which point Baker urged Ms. Acierno to have sex with him. Ms. Acierno states that Baker twice attempted to touch her in an intimate manner. Eventually, he left [D.E. 25; Attachment 3].

These incidents were reported to Robert Weissmuller, the regional supervisor. On April 5th, Terry Lovelace (the operations manager and plaintiff's immediate supervisor) met the plaintiff by arrangement at the regional office and informed him that Mr. Weissmuller wished to speak with him later that day [Plaintiff's deposition, Volume I; p. 160]. The plaintiff was informed

---

8. Of course, we recognize that the words "get together" could also imply a less intimate relationship. However, the additional remarks allegedly made by Baker, as well as the circumstances under which they were made, make it clear that Baker was speaking of a sexual relationship. Evidently, that is the way Mrs. Froeba understood it, and, even viewing these facts in the light most favorable to the plaintiff, such statements can not be reasonably construed any other way.

then that there were charges of sexual harassment made against him [Plaintiff's deposition, Volume I; p. 160]. Baker and Lovelace spent approximately 45 minutes together, discussing the Jean Acierno incident [Plaintiff's deposition, Volume I; pp. 161–163].[9] When Baker talked with Jamie Measey that same day, he was told that there were actually four or five complaints of sexual harassment against him. [Plaintiff's deposition, Volume I; p. 164].

At approximately 5:30 PM, Baker met with Mr. Weissmuller. After asking Baker whether he knew of the complaints against him, Weissmuller informed Baker that an investigation of the charges would be made [Plaintiff's deposition, Volume I; p. 166]. Two days later, Plaintiff was told to stay out of his stores pending the conclusion of the investigation [Plaintiff's deposition, Volume I; p. 158]. Apparently, he was given leave with pay [Plaintiff's deposition, Volume I; p. 144].

An investigator for McDONALD's interviewed several employees who were working or had worked with Baker, in addition to Beverly Froeba and Jean Acierno [D.E. 25; Attachment 4].[10] These employees stated the following: Two female employees stated that Baker frequently made joking remarks to them, asking when they could go to bed together (Baker admits to telling jokes involving sex in the presence of female employees [Plaintiff's Deposition, Volume I; pp. 105–108, 224]). Mr. Baker's former supervisor, Harry Coaxum (a black male—*See*, Plaintiff's deposition, Volume II, p. 186) received a complaint from a black female employee named "Alice" [Plaintiff's deposition, Volume II; p. 185]

that the plaintiff had rubbed his sexual organs against her. He states that he took no disciplinary action against Baker, as Baker had denied that the incident occurred. Mr. Coaxum does state that he warned the plaintiff that sexual harassment could result in termination [D.E. 25; Attachment 5]. Preshell Mills, a black female, states that Bob Baker told her at a conference in St. Petersberg that the only way to get ahead at McDONALD's was to go to bed with her superiors. She states that, at the time, Baker had much more experience than she did as a store manager and that she understood his comments to mean that she should go to bed with him [D.E. 25; Attachment 6].

At the conclusion of this investigation, the plaintiff was called into Mr. Wisemuller's office again (on April 20th). He was told at that time that he was terminated from employment at McDONALD's.

### Conclusions of Law

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and personal jurisdiction over plaintiff and defendant McDONALD's. The three individual defendants have been dismissed for plaintiff's failure to timely serve them.

The plaintiff alleges claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3) and 2000e for employment discrimination, as well as claims brought directly under the Thirteenth and Fourteenth Amendments. The plaintiff also alleges common law claims for slander and defamation. We will discuss each claim separately.

---

**9.** Essentially, the plaintiff admits that the incidents regarding Ms. Acierno and Mrs. Froeba occurred, but, in each case, it was the woman who was the aggressor, not him. Plaintiff's version is that these women wanted to have sex with him, but he declined the invitations.

Our decision to grant summary judgment does not rest on whether the incidents of sexual harassment described by these witnesses are true or not. The standard here is not whether these incidents occurred, but whether McDONALD's could reasonably believe that they had occurred. *See*, Conclusions of Law, *infra*, at p. 1482. Thus, the disputed factual accounts of these incidents will not preclude summary judgment.

**10.** Although this entire investigative report is hearsay, and in some cases, hearsay within hearsay, no objection to its inclusion with defendant's motion for summary judgment was made. Since only admissible evidence may be considered on a motion for summary judgment, we will not consider those out of court statements included in the report for the truth of the matters asserted. We may, however, consider that report in connection with the knowledge of the defendant McDONALD's; i.e., whether the report supports McDONALD's reasons for firing the plaintiff. We may also consider that report as proof that McDONALD's did, in fact, conduct an investigation of the charges against the plaintiff.

In order to prevail on a motion for summary judgment, the movant must demonstrate that there reamins no genuine issue of material fact which remains to be decided, and that he/she/it is entitled to judgment as a matter of law. *Federal Rules of Civil Procedure*, Rule 56(c). Once the moving party has supported their motion for summary judgment, the burden shifts to the party opposing the motion to come forward with significant probative evidence demonstrating that a triable issue of fact does exist. *American Viking Contractors, Inc. v. Scribner Equipment Company*, 745 F.2d 1365 (11th Cir.1984). Moreover, if, after the completion of discovery, there is a complete failure of proof with regard to an essential element of the plaintiff's claim, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

After a review of all of the pleadings, memoranda, affidavits and depositions in the court file, it appears that there is no genuine issue of material fact which remains to be decided. Those undisputed facts are set forth, *supra*. Based on those facts, it appears that the defendant is entitled to judgment as a matter of law, as discussed below.

### 42 U.S.C. § 1983

■ The plaintiff admits that defendant McDONALD's is a private corporation [Plaintiff's deposition, Volume III; pp. 184–185]. At the very least, no evidence has been submitted by the plaintiff to show that this defendant is anything but a private corporation. An essential element of a claim brought pursuant to § 1983 is that the alleged wrong was committed by a person (or entity) acting under color of or pursuant to the law of a state. There has been a complete failure of proof as to this essential element of plaintiff's claim, and, therefore, summary judgment should be granted.

### 42 U.S.C. § 1985(3)

The plaintiff attempts to recover under this section for an alleged conspiracy among the defendant corporation and several of its agents, supervisors and employees. The object of this alleged conspiracy was to deprive the plaintiff of rights guaranteed under the 13th and 14th Amendments, and to deprive him of rights guaranteed by 42 U.S.C. §§ 1981 and 2000e. In order to prevail on this claim, the plaintiff would have to prove each of the following elements:

(1) The existence of a conspiracy;

(2) For the purpose of depriving, either directly or indirectly, any person or class of persons, of the equal protection of the laws or of the equal privileges and immunities under the laws;

(3) Some act in furtherance of the conspiracy; and

(4) That the plaintiff was injured in person or property or deprived of having or exercising any right or priviledge of a citizen of the United States.

*Griffin v. Breckenridge*, 403 U.S. 88, 102–103, 91 S.Ct. 1790, 1798–1799, 29 L.Ed.2d 338 (1971).

■ This claim fails as a matter of law for several reasons. First, with regard to the first element enumerated above, the plaintiff has failed to prove the existence of a conspiracy.

■ A corporation is an amorphous entity having no substance except in law. It can only act through its officers, agents and employees. A conspiracy requires the combination of two or more persons—i.e., the meeting of two independent minds intent on one fell purpose. Since the collective "minds" of a corporation's officers, agents, and employees constitute the single "mind" of the corporation, corporate officers, agents and employees, while acting within their scope of employment, are incapable as a matter of law of conspiring among themselves or with the corporation. *See, Cross v. General Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984); *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972). *See, also, Givan v. Greyhound Lines Inc.*, 616 F.Supp. 1223 (S.D.Ohio 1985); *Weaver v. Gross*, 605 F.Supp. 210 (D.C.D.C.1985); *Nation v. Winn–Dixie*

*Stores, Inc.,* 567 F.Supp. 997, *reaffirmed,* 570 F.Supp. 1473 (N.D.Ga.1983); and *Klausner v. Southern Oil Co. of New York, Inc.,* 533 F.Supp. 1335 (N.D.N.Y. 1982). *Contra, Novotny v. Great American Federal Savings & Loan Association,* 584 F.2d 1235, 1256–59 (3d Cir.1978), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).[11] To hold otherwise would be tantamount to saying that a person or entity may be liable for conspiring with themselves.

Second, the plaintiff has failed to show, as a matter of law, that he or any class of persons was deprived of the equal protection of the laws or of equal priviledges and immunities under the laws as a result of the alleged conspiracy. To satisfy this element, the plaintiff must show a deprivation of equal protection, privileges or immunities secured by a specific statute or constitutional provision. In this respect, he has alleged that he was denied rights guaranteed under the 13th and 14th Amendments, and rights guaranteed under 42 U.S.C. §§ 1981 and 2000e.

■ In order to prevail on his claim that there existed a conspiracy to deprive him of his due process and equal protection rights guaranteed by the 14th Amendment, the plaintiff must show state action; i.e., a conspiracy with state employees or officials (state actors). *Terry Properties, Inc. v. Standard Oil Co.,* 799 F.2d 1523, 1533–34 (11th Cir.1986) ["Private actors may be liable for infringement of 14th Amendment rights *only* through conspiracy with state actors in violation of 42 U.S.C. § 1985(3)." *Id.* (emphasis ours)].

All of the named defendants are "private" actors. There is no allegation—and certainly no proof—that the corporation, or any corporate employee, combined or conspired with any state actor. Hence, Baker's claim under § 1985(3), to the extent it is predicated on 14th Amendment violations, must fail. Additionally, any claim plaintiff intends to assert directly under the 14th Amendment must be denied as well, for the same reason.

■ Likewise, any claim predicated on a deprivation of equal protection rights guaranteed by 42 U.S.C. § 2000e (Title VII) must fail. Title VII can not form the basis of a suit brought pursuant to § 1985(3) the rationale being that allowing such a claim would permit a plaintiff to by-pass the comprehensive procedural requirements of Title VII. *Great American Federal Savings & Loan Assoc. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

■ So, what we have left is plaintiff's § 1985(3) claim based on alleged violations of the 13th Amendment and 42 U.S.C. § 1981. A conspiracy to violate the 13th Amendment may form the basis of a suit brought pursuant to § 1985(3). *Griffin v. Breckenridge,* 403 U.S. at 106–106, 91 S.Ct. at 1799–1800. In addition to abolishing slavery and involuntary servitude, the 13th Amendment gives Congress the authority to legislate against acts of any state and any private individual which constitute the "badges and incidents of slavery". So, the Thirteenth Amendment is implicated when it is alleged that a private individual or entity deliberately acted in a way to segregate, humiliate or belittle a person of the Negro race in a way that prevented such a person from freely exercising a right guaranteed to all citizens. In short, a conspiracy to violate the Thirteenth Amendment as proscribed by § 1985(3) involves intentional discrimination on the basis of a black person's race or color.[12]

---

**11.** At least one of our sister courts in this district have followed the rule in *Novotny. See, Jacobs v. Board of Regents,* 473 F.Supp. 663, 670 (S.D.Fla.1979) (Gonzalez, J.). The more recent trend, however, has been to disallow claims which are based on an alleged conspiracy among corporate employees or between corporate employees and the corporation. We choose to follow this more recent expression of the law.

**12.** The plaintiff does not claim, nor is there any evidence to show, that he was forced into involuntary servitude. In addition to an outright prohibition on slavery and involuntary servitude, the Thirteenth Amendment also prohibits acts which classify a person as a former slave. For example, treating black persons different from white persons, and thereby segregating them, may violate the Thirteenth Amendment.

The plaintiff may not maintain a cause of action directly under the Thirteenth Amendment for employment discrimination. *See, Sanders v. A.J. Canfield Co.,* 635 F.Supp. 85 (N.D.Ill.1986); *Westray v. Porthole, Inc.,* 586 F.Supp. 834 (D.Md.1984); and *Vietnamese Fisherman's Assoc. v. Knights of Ku Klux Klan,* 518

A claim predicated on a conspiracy to deprive any person of rights guaranteed by 42 U.S.C. § 1981 may also form the basis of an action brought pursuant to § 1985(3). Like a claim predicated on 13th Amendment violations (where the plaintiff claims that the defendant acted to impose upon him the "badges and incidents of slavery"), the plaintiff must show intentional discrimination on the basis of race.

■ In order to prevail on his § 1985(3) claim—whether it is predicated on violations of the Thirteenth Amendment, or § 1981, or both—the plaintiff must prove at least two things: (1) A conspiracy, and (2) intentional discrimination on the basis of his race. As previously discussed, the plaintiff would be unable to show a conspiracy as a matter of law, and, therefore, his entire claim under § 1985(3) must fail. But, even if plaintiff was not legally foreclosed from showing a conspiracy based on the facts of this case, the facts do not show any intent to discriminate, or any intent to violate the substantive provisions of the Thirteenth Amendment and/or § 1981. In short, the plaintiff has failed to come forward with significant probative evidence to show that the defendant intended to deny the plaintiff rights guaranteed by the Thirteenth Amendment and/or § 1981, or to raise an issue of fact in that regard.

### Title VII and § 1981 Claims

■ 42 U.S.C. § 1981 guarantees to all persons within the jurisdiction of the United States certain enumerated rights (for e.g., the right to make and enforce contracts, to sue, be parties and give evidence, etc.). The elements of a claim under this section are: (1) That plaintiff is a member of a racial minority; (2) An intent to discriminate on the basis of race by the defendant; and (3) That the discrimination concerned an "enumerated activity" (i.e., one of those activities, or rights, directly or indirectly enumerated in the statute). The "enumerated activity" implicated in this case is the right to "make and enforce contracts". Racial discrimination concerning employment contracts is within the pur-

view of § 1981. *See, Johnson v. Railway Express Co.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

■ Title VII (42 U.S.C. § 2000e) prohibits certain employment practices, to wit: Failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). In order to prevail on a claim brought pursuant to Title VII, a complainant must show that (1) He is a member of a protected group (e.g. racial minority); and, (2) That race—or some other unlawful criteria—was a motivating factor in the employment decision or practice which was applied to him (i.e. an intent to discriminate).

■ It is generally recognized that proof sufficient to sustain a claim under Title VII will also support a claim under § 1981 and vice-versa. *Scarlett v. Seaboard Coastline Railroad Co.*, 676 F.2d 1043, 1052-53 (5th Cir.1982), *citing, Baldwin v. Birmingham Board of Education*, 648 F.2d 950, 954-55 (5th Cir.1981). *See, also, Lewis v. University of Pittsburgh*, 725 F.2d 910 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 802 (1984) and *Whatley v. Skaggs Companies, Inc.*, 707 F.2d 1129 (10th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983). So, we may consider both of these claims—and the proof relating to them—together.

The plaintiff's employment discrimination claims are essentially ones for disparate treatment. The plaintiff contends that his employer treated him, a black male, differently than other similarly situated white male employees and that the only apparent reason for this disparity in treatment was the plaintiff's race or color. Within the specific factual context of this case, the plaintiff claims that he was discharged from employment based on allegations of sexual harassment of female em-

---

F.Supp. 993 (S.D.Texas 1981). Rather, the plaintiff must base his claims on one of the implementing statutes, e.g., 42 U.S.C. § 1985(3)

or § 1981. So, any claim plaintiff intends to assert directly under the Thirteenth Amendment is dismissed.

ployees whereas other white males also accused of sexual harassment were not discharged.

The allocation of proof in disparate treatment cases is as follows: *First*, the plaintiff must present, by a preponderance of the evidence, a *prima facie* case of discrimination. To do this, the plaintiff must show that he was discharged under circumstances which give rise to an inference of discrimination. *Second*, once the plaintiff has proved a *prima facie* case of discrimination, the burden shifts to the defendant who must produce evidence that a legitimate non-discriminatory reason (or reasons) existed for the challenged employment action. Note that the defendant's burden here is only one of production, not pursuasion. *Third*, the plaintiff must then show, by a preponderance of the evidence, that, notwithstanding the articulated reason for his discharge, he was terminated because of his race and the reasons put forth by the defendant are a mere pretext for accomplishing the discriminatory act. *See, McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *Mauter v. Hardy Corp*, 825 F.2d 1554 (11th Cir.1987).

In order to prove a *prima facie* case of discriminatory discharge, the plaintiff must show that he is a member of a racial minority, that he was qualified for the position he held and was performing it satisfactorily, that he was discharged, and that he was replaced by a non-minority person whose qualifications were equal to, or inferior, to his. *See, e.g., Mauter v. Hardy Corp.*, at 1556–1557 (based on a modified version of the four-part test set forth in the *McDonnell–Douglas* case). *Compare, Davin v. Delta Airlines, Inc*, 678 F.2d 567, 570 (5th Cir.1982).

After a review of the record before us, we find that the plaintiff has shown that he is a member of a racial minority (he is black), that he was qualified for his position and was performing his duties in a satisfactory manner, and that he was discharged. There is no evidence to show that the plaintiff was replaced by a non-minority person whose qualifications were equal to, or inferior, to his.

Although the plaintiff states in his unfiled affidavit that he was replaced by an unnamed white male whose qualifications were inferior to his, this statement is insufficient to prove that fact or to create an issue fact, as there is nothing to show that plaintiff's statement is based on personal knowledge. Moreover, it appears to be merely conclusory, and is unsupported by other factual statements to verify its accuracy. For instance, had the plaintiff included the name of this person, his training, the store at which he was working, and other similar facts, an issue of fact might have been created.

Instead, we must find that the plaintiff has failed to carry his burden of presenting a *prima facie* case of discrimination. Since this would be an essential element of plaintiff's proof at trial, this failure results in summary judgment in favor of the defendant.

Even if plaintiff *had* met his initial burden, we would still be required to enter summary judgment in favor of the defendant, since the defendant has produced a legitimate, non-discriminatory reason for the plaintiff's discharge. An employer who shows that there were reasonable grounds to believe that the discharged employee had made unwelcome sexual overtures to female employees rebuts any *prima facie* case presented by the plaintiff. *French v. Mead Corp.*, 33 FEP Cases 635 (S.D.Ohio 1983); *Jones v. Intermountain Power Project*, 794 F.2d 546 (10th Cir.1986).

The plaintiff contends in his unfiled affidavit and in deposition that none of the alleged incidents of sexual harassment occurred. Technically, it is not really relevant whether they occurred or not. What *is* important is that McDONALD's had reasonable grounds to *believe* that they had occurred. In this case, it appears that there was ample support for McDONALD's belief.

An investigator was designated to interview the women who had accused the plaintiff. This investigator attempted to interview the plaintiff (to get the plaintiff's side

of the story), however, the plaintiff refused to speak with the investigator. Not only was there more than one incident of sexual harassment alleged, but there was more than one accusor. Furthermore, at least two of the women accusing the plaintiff were black ("Alice" and Preshell Mills). It does not appear that any of these women had any reason to falsely accuse the plaintiff, nor does it appear that any of these women were working in concert with one another (in fact, that is not even alleged). All of these circumstances support the defendant's position that there were reasonable grounds to believe that the plaintiff had sexually harassed female employees.

The plaintiff argues that the charges of sexual harassment were a mere pretext for discrimination. In this respect, he states as follows:

1. He was never told of McDONALD's policy prohibiting sexual harassment.

2. He was really fired because he had given his former supervisor's girlfriend a low rating.

3. That several McDONALD's employees had had affairs with, or had dated, or had even married other McDONALD's employees and they had not been fired.

4. That two white male supervisors—Charles Selebra and Fred Collins—had sexually harassed female employees and had not been fired.

We will discuss each reason separately.

First, as an area supervisor, the plaintiff understood that his duties included the prevention and elimination of racial and sex discrimination in the workplace (Plaintiff's deposition, Volume II; pp. 50–54). Not only was the problem of sexual harassment discussed at one training program plaintiff attended in late 1981 (plaintiff's deposition, Volume I; pp. 113–116), but plaintiff also admits to having had some "common sense" understanding of what would constitute unacceptable behavior in the workplace (Volume I; pp. 122–124, 149; Volume II; pp. 50–54). Plaintiff's understanding was such that he reprimanded several male employees who had made suggestive remarks to a female employee. Thus, it is not important whether the plaintiff knew the exact wording of McDONALD's policy against sexual harassment. What *is* significant is that the above facts demonstrate that the plaintiff knew what type of conduct was inappropriate to the workplace, or among employees.

Second, the plaintiff contends that he was fired because he gave Marie Sakelos, one of the managers plaintiff supervised and the alleged girlfriend of plaintiff's supervisor, a low rating. He supposedly gave her a "three". A "five" is the lowest rating available. (Plaintiff's deposition, Volume I; pp. 195–197). We note here that this contention does not involve racial discrimination. While it implies that plaintiff may have been fired for some other improper motive, it does not involve an employment practice prohibited by § 1981 and § 2000e. In any case, this contention by the plaintiff (made in his unfiled affidavit) is refuted by his own deposition testimony, where he states that the lowest rating he ever gave was a "three" and he gave that rating to a manager named Joe Kopezza (Plaintiff's Deposition, Volume I; pp. 197–200). Furthermore, Fred Collins (the alleged boyfriend of Marie Sakelos) was not plaintiff's supervisor when he did rate her. (Plaintiff's deposition, Volume I; pp. 197–198; Volume III; pp. 27–33).

Third, in stating that several McDONALD's employees were dating one another and were not terminated, the plaintiff exhibits a lamentable failure to perceive the difference between unwelcome sexual advances and a relationship between consenting adults. There is not a scintilla of evidence to show that any other McDONALD's employee violated a corporate policy by engaging in a voluntary social relationship with other employees. A consensual relationship is a far cry from the conduct plaintiff was accused of committing. In sum, the plaintiff was not fired because he was dating another employee. He was fired for allegedly pressuring unwilling female employees to have sex with him.

Last, but not least, it is plaintiff's contention that other white males at McDONALD's sexually harassed female employees and were not discharged as he was.

These alleged incidents involve two white males—a Mr. Selebra and a Mr. Fred Collins.

Baker claims that a white female employee named Patricia Fullbright told him that her manager, Mr. Selebra (who was married) wanted to have an affair with her, but she had refused. As a result of her refusal, she had been, or was going to be, discharged [Plaintiff's deposition, Volume II; pp. 73–75]. Ms. Fullbright also told the plaintiff that she had, or was going to, complain to Mr. Selebra's supervisor, a Mr. Steve Reynolds [plaintiff's deposition, Volume II; pp. 74–75]. No affidavit or other document made by Ms. Fullbright or Mr. Reynolds was submitted by the plaintiff. Baker's testimony as to those facts is inadmissible hearsay, and may not be considered on a motion for summary judgment. *See,* Fed.R.Civ.Pr. 56(e). In addition, although plaintiff states that Ms. Fullbright *said* she was going to complain to Mr. Selebra's supervisor, there is no evidence to show that she ever *did* complain to a McDONALD's supervisor, except the plaintiff. The plaintiff does not state that he passed her complaint on to anyone else.

Baker also claims that his former supervisor, Fred Collins, engaged in sexual harassment and was not fired. The first of these alleged incidents concerned a Ms. Debra Davis. Ms. Davis's affidavit is included with the defendant's motion for summary judgment (D.E. 25, Attachment 7). Ms. Davis states that when she was introduced to Fred Collins in 1980, she thought he had touched her in an offensive way when they were shaking hands. She immediately complained, and Mr. Collins apologized. Ms. Davis states that, as far as she is concerned, the entire incident was a misunderstanding and denies that Fred Collins had ever sexually harassed her in any way.

Baker's description of a second incident involving Fred Collins is similar to the charge he makes against Mr. Selebra. Baker alleges that Fred Collins was "trying to date" a Ms. Sue Polozker, but she would have nothing to do with him. As with Baker's contentions regarding Ms.

Fullbright and Mr. Selebra, his account of this incident is inadmissible hearsay which may not be considered here.

So, after a consideration of all of plaintiff's "proofs" in opposition to the motion for summary judgment, there is nothing before us to support his allegation that the reason given by the defendant McDONALD's for his discharge was a pretext for discrimination. Accordingly, summary judgment should be entered in favor of the defendant on plaintiff's claims brought pursuant to 42 U.S.C. §§ 1981 and 2000e.

### Slander and Defamation Claims

The plaintiff claims that McDONALDS defamed him by publishing the fact of his discharge and the reasons therefor to other McDONALD's employees and to plaintiff's prospective employers. In order to prevail on a claim for slander and/or defamation, the plaintiff must show that the defendant made a false statement of fact of or concerning the plaintiff, that the false statement was communicated to a third person, with malice, and that the plaintiff sustained damages. *See, e.g., Axelrod v. Califano,* 357 So.2d 1048 (Fla. 1st DCA 1978). Here, we will only concern ourselves with the element of publication, which is one of the essential elements of a claim for defamation/slander. *Owner's Adjustment Bureau, Inc. v. Ott,* 402 So.2d 466 (Fla. 3d DCA 1981).

 It is abundantly clear that any publication to other McDONALD's employees (except the plaintiff's supervisors) concerning the cause of plaintiff's discharge was made by the plaintiff, not by McDONALD's. *See,* Plaintiff's deposition, Volume III; pp. 103, 115–116, 153–163. Not only does the plaintiff have no evidence to show that McDONALD's communicated his discharge and the reason for it to any other McDONALD's employee, but plaintiff also admits that he has no evidence to show that McDONALD's communicated those facts to any company where the plaintiff had an application for employment pending. *See,* Plaintiff's deposition, Volume III; pp. 146–149.[13] Since publica-

---

13. The plaintiff claims that a McDONALD's supervisor did tell his (plaintiff's) brother-in-law that plaintiff had been discharged for sexual

harassment (plaintiff's deposition, Volume III, pp. 128–129), however, this statement is hear-

tion is an essential element of plaintiff's claim which he would have to prove at a trial, this complete lack of proof as to any publication warrants the entry of summary judgment in favor of defendant McDONALD's.

In view of all of the foregoing, it is therefore

ORDERED and ADJUDGED that the defendant's motion for summary judgment (D.E. 25) is Granted on all of the claims asserted in the complaint. Consequently, the Clerk shall enter judgment in favor of the defendant and against the plaintiff who shall take nothing. The defendant shall be awarded all of its costs as part of this judgment, since the defendant is the prevailing party. The defendant shall submit an affidavit as to costs within fifteen (15) days from the date of this Order. As part of this judgment, the defendant is entitled to its attorney's fees incurred as a result of the Title VII claim. Therefore, the defendant shall submit an affidavit as to its total attorney's fees, conforming to the criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974), as adjusted by *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911 (11th Cir. 1982). One seventh of the total fee shall be awarded to defendant as prevailing party in the Title VII action (*See*, Our Order Granting Motion for Sanctions in Part for a further discussion as to attorney's fees). The defendant shall submit said affidavit, and any legal memoranda it wishes the Court to consider in connection therewith, within fifteen days from the date of this Order. The plaintiff shall have ten (10) days from the date he receives the defendant's submissions to file objections or legal memoranda in opposition to the amount of attorney's fees.

It is FURTHER ORDERED and ADJUDGED that any factual findings which were included in the section labeled "Conclusions of Law" are hereby made a part of

say. No affidavit by plaintiff's brother-in-law, or other admissible testimony, was filed by the

the findings of fact of this Court, and vice-versa.