Kwabena **AKYEAMPONG**

v.

**COPPIN STATE COLLEGE, et al.**

**Civ. No. Y-81-624.**

United States District Court,
D. Maryland.

May 10, 1982.

Jonathan A. Azrael, Baltimore, Md., and Michael E. Geltner, Washington, D. C., for plaintiff.

Dorothy A. Beatty, Asst. Atty. Gen. for State of Md., and Susan B. Blum, Asst. Atty. Gen., Baltimore, Md., for defendants.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Plaintiff, a Black African-born former instructor at Coppin State College, filed suit against the college, the president of the college, the vice-president for Academic Affairs, the Dean of the Division of Arts & Sciences (plaintiff's former Division), the chairperson of plaintiff's former department, and a fellow professor. The amended complaint charges violations of 42 U.S.C. §§ 1983 and 1985(3) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Title VII portion of the complaint was dismissed as barred by the statute of limitations. The remainder of the case was bifurcated, and the Court heard the liability portion in a one-day trial. The Court must decide at this juncture whether the plaintiff was deprived of a Fourteenth Amendment property or liberty interest without due process of law and whether the defendants conspired to discriminate against African-born faculty members.

## FACTS

The Court heard testimony from the plaintiff, Coppin's President, Dr. Calvin Burnett, Dr. Jean Spencer, Executive Director of the Board of Trustees for State Universities and Colleges, and Dean of the Division of Arts and Sciences, Dr. Hrabowski. The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the F.R.Civ.P.

The plaintiff was employed as an instructor at Coppin State College from 1970 until August 15, 1979. He had been tenured since September, 1978. The contract under which plaintiff was employed incorporated the Board of Trustees' Regulations and Procedures Governing Academic Freedom and Tenure.

Funds from the federal government are/were available to developing institutions under the Basic Institutional Development Program, Title III of the Higher Education Act of 1965, 20 U.S.C. § 1051 *et seq.* Title III funds are/were available to institutions such as Coppin State for use in faculty development. The school sets goals and the federal government grants awards based on the goals the applicant school sets out in its application for funds. Dr. Calvin W. Burnett, President of Coppin State College, testified that Coppin State had set its faculty development goal to increase the number of doctorates teaching at the school from 56% (in 1978) to 65% by 1981. The funds granted by the federal government under the Title III award in 1979–80 were intended to pay for substitute instructors for the time that full time instructors were on study leave pursuing a course of full time study at another institution. During the study leave, the faculty members would continue to be salaried at Coppin State. The school's criteria for choosing which faculty members would be awarded a study leave included consideration of the departments where there was a critical shortage of doctorates on the faculty.

In order to obtain a study leave from Coppin State, a faculty member must complete an application indicating the faculty member's proposed field of study and the degree sought. The application must be approved by the applicant's department head and the division Dean before it is submitted to the Faculty Study Leave Committee. Once the Faculty Study Leave Committee approves the Title III leave, the application must be endorsed by the President of the College and sent to the Board of Trustees for final approval. Board approval is pro forma when the application is received with the college president's endorsement. The president of the college notifies the applicant when the application is being forwarded to the Board of Trustees. The applicant must agree to return to teaching duties at the college for at least two years following the study leave. If the applicant agrees to return, and the Board has approved the leave, the president notifies the applicant that the leave is authorized.

Plaintiff first applied for Title III study leave in 1975. He applied in successive years until leave was finally approved by the faculty committee in 1978. The leave was not funded in 1978, however, and plaintiff renewed his application for the 1979–80 academic year. Plaintiff's application stated that his proposed field of study and degree sought were: "Doctor of Philosophy in International Economic Relations." All those who approved or endorsed the study leave application, including defendants Lawrence Pearl, head of the Management Science and Economics Department, Dr. Hrabowski, and Dr. Burnett, did so with the understanding that plaintiff intended to pursue course work leading to the Ph. D. at the Johns Hopkins School of Advanced International Studies (S.A.I.S.) in Washington, D. C.[1] The Faculty Study Leave Committee approved the leave on March 31, 1979, and Dr. Burnett endorsed the leave and forwarded the application for approval of the Board of Trustees on April 24, 1979.

Also on April 24, 1979, Dr. Burnett wrote to plaintiff advising him that he had forwarded the application to the Board and

1. Plaintiff had received his Masters from S.A. I.S. in 1970. Since then, he had taken courses at the Johns Hopkins University Homewood campus in Baltimore as a special student. On his application he indicated that he already had 16 credit hours to apply toward his doctorate. Dr. Burnett testified that his endorsement was based on the belief that plaintiff had enrolled in a Ph. D. program at S.A.I.S. and that he had already spent some of his own money on courses completed for the doctorate.

In reality, plaintiff has not yet been accepted to S.A.I.S. in a Ph. D. program, nor has he received any representation from anyone in authority at S.A.I.S. that his credits from the Homewood campus and from Harvard (*see infra*) will be acceptable for the doctoral program. Plaintiff claims that as a holder of an M.A. from S.A.I.S. he is eligible to be considered for admission to the Ph. D. program without further course work, but he admitted at trial that he needed to complete further course work before the doctorate could be conferred on him because his Master's Degree was conferred so long ago.

that Dr. Burnett would notify plaintiff of the outcome after the May 14, 1979 Board meeting. Dr. Burnett also advised plaintiff in this letter of the requirement to return to the college to teach for two years after the completion of his study leave. At the May 14, 1979 meeting the Board of Trustees approved plaintiff's leave. Dr. Burnett never informed plaintiff of the Board approval. On June 14, 1979, plaintiff wrote to Dr. Burnett and agreed to return to the college to teach for two years after the study leave.

Meanwhile, plaintiff had participated in a voluntary teacher evaluation program and was evaluated as satisfactory and "quite good" in March, 1979. On April 22, 1979, plaintiff was involved in a car accident which partially incapacitated him. On April 24, 1979, plaintiff's father died in Ghana, and plaintiff had to travel to Africa for the funeral. While he was gone, others, including defendants Pearl and Alpern,[2] covered his classes. Their experience raised some concern regarding his teaching performance. In May, Dr. Burnett became aware that plaintiff did not intend to pursue course work at Johns Hopkins S.A.I.S., but instead had made plans to attend Harvard University. Dr. Burnett was concerned that plaintiff's altered study plans would not conform to the goals that the school had set for Title III funds.

On June 4, 1979, defendants Pearl and Hrabowski met with plaintiff to raise their concerns about his teaching performance. By memorandum to plaintiff on June 5, 1979, Dr. Pearl requested that plaintiff respond in writing within 5 days to the "concerns" raised at the meeting. The memorandum also requested a response to questions about plaintiff's study plans. Plaintiff did not respond in writing. On June 14, 1979, however, he did write the letter to Dr. Burnett agreeing to teach two years after his study leave. On June 15, 1979, Dr. Burnett wrote to plaintiff advising him that final approval of his study leave could

not be made until his study plans had been clarified. Dean Hrabowski also wrote to plaintiff on June 15, 1979, echoing Dr. Burnett's letter, and asking plaintiff to respond by June 20, 1979.

By letter dated July 12, 1979, Dr. Burnett notified plaintiff of his salary for the 1979–80 academic year, and plaintiff accepted reappointment. Also on July 12, 1979, plaintiff requested a meeting to resolve the matters raised at the June 4, 1979 meeting. A meeting was held at the office of the Attorney General on July 30, 1979, at which plaintiff was present, represented by counsel. Also present were Dr. Burnett, Dr. Pearl and Assistant Attorney General Humphries. Again, defendants requested that plaintiff advise them if he had changed his study plans. At this meeting, plaintiff advised those present that he did intend to attend Harvard University. He was asked to detail his plans in writing by August 2, 1979. This deadline was later extended until August 8, 1979. Plaintiff offered no written response.

By letter dated August 9, 1979,[3] Dr. Burnett advised plaintiff that the Kennedy School at Harvard University had advised Coppin State that plaintiff had been admitted to a one-year masters degree program in Public Administration, that this was inconsistent with his study leave application, and that, therefore, his study leave was disapproved. The letter also advised plaintiff that he was expected to return to the college on August 15, 1979, to prepare for the coming academic year.

By letter of August 9, 1979, plaintiff wrote a response to Dr. Pearl's "concerns" and requested that the question be referred to an appropriate body for resolution. The August 9 letters crossed in the mail. Plaintiff did not show up for orientation on August 15, 1979. By letter dated August 15, 1979, Dr. Burnett advised plaintiff that the college assumed from his failure to return to Coppin State on that date that he had decided to end his relationship with the

---

2. Dr. Murray Alpern was a fellow instructor.

3. Plaintiff claims that he received Dr. Burnett's August 9, 1979 letter by certified mail on August 20, 1979.

college. The failure to return was treated as a resignation. Plaintiff responded to the August 15 letter by requesting a sabbatical leave. By telegram followed by an explanatory letter, Dr. Burnett denied the sabbatical leave. Dr. Burnett's letter of August 28, 1979, indicates that the college was still unsure of plaintiff's plans for the coming academic year. Classes began at Coppin State on August 27, 1979.

Plaintiff answered Dr. Burnett by letter dated September 7, 1979, informing Dr. Burnett that he had not resigned his teaching position, but that he intended to take leave to pursue further studies during the 1979–80 academic year. On September 24, 1979, Dr. Burnett wrote to plaintiff informing him that his absence was not approved, was in violation of his employment contract, and that the college considered his employment as an instructor at end. Dr. Burnett also wrote to the Executive Director of the Board of Trustees indicating that Coppin State had cancelled the leave because it had been granted based on erroneous information, but that the plaintiff had left anyway.

Plaintiff attended Harvard University during the 1979–80 academic year in the program leading to a Mid-Career Masters of Public Administration. This program is designed as advanced study for mid-careerists in federal, state, and local government and politics or other forms of public service. Plaintiff received no compensation from Coppin State College in the 1979–80 academic year. Since August, 1979, plaintiff has not been employed full time. He is now teaching part time at the Patuxent Institution.

## DISCUSSION

Plaintiff seeks reinstatement, back pay and punitive damages, claiming that he has been denied property and liberty rights without due process of law in violation of the Fourteenth Amendment, and alleging a conspiracy to discriminate against African members of the faculty. Plaintiff claims that as a tenured faculty member he was entitled to the procedural rights set out in the Regulations of the Board of Trustees. This would include a hearing prior to termination. Plaintiff also claims that the "concerns" expressed by those in his department created a liberty interest which also must be accorded due process rights. Finally, plaintiff claims that he had a property interest in the study leave itself, and that the leave could not be taken away without due process. If all else fails, plaintiff asserts that defendants' noncompliance with their own rules for withdrawing study leave provided justification for plaintiff to assert a "claim of right" to the study leave, that he was justified in taking his leave rather than showing up for work at the appointed time, and that this dispute is sufficient to confer a right at least to a termination hearing. This Court cannot agree.

■ The Court must look at the two claims of property interest separately. It is true that under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), a tenured employee of the state has a property interest requiring due process protection. A public employee may relinquish his rights, however, by voluntary action, such as the intentional violation of his employment contract. *Kalme v. W. Virginia Board of Regents*, 539 F.2d 1346 (4th Cir. 1976). The evidence adduced at trial shows that this case is indistinguishable from *Kalme*. In the instant case, as in *Kalme*, plaintiff had been offered and had accepted reappointment for the 1979–80 academic year. With no notice to the college, plaintiff failed to appear on the appropriate date to begin the academic year. Plaintiff had never been advised by the president that his study leave had been finally approved;[4] therefore, he should have appeared at the appointed time. He was absent on the day that classes resumed. His failure to appear prompted a letter from Dr. Burnett inform-

---

4. Dr. Burnett's letter dated April 24, 1979, advised plaintiff that his application had been forwarded to the Board of Trustees, but it also advised plaintiff that Dr. Burnett would notify him of the final decision. Later, plaintiff was advised in writing by Dr. Burnett that there were problems which would prevent the final approval of his study leave. Plaintiff cannot have had a reasonable belief that he was entitled to take his study leave.

ing plaintiff that the college considered his employment at an end. The opinion of the Fourth Circuit in *Kalme* is applicable here:

The State, through the college president and the Board of Regents, took no action against Kalme; the government did nothing to him; nor did it seek to deprive him [of] any property or liberty interest. To the contrary, the college was quite willing to have him return and signed a contract to accomplish precisely that. The conduct which led to Kalme's loss of employment and tenure rights was initiated by Kalme himself. The Fourteenth Amendment does not protect citizens against the voluntary, unilateral relinquishment of known rights. Kalme intentionally and flagrantly violated his contract of employment with the college, and it was upon this contractual relationship that any "property interest" depended. By failing to appear for work pursuant to the terms of his agreement, Kalme abandoned his rights under it. The president's letter . . . was merely an acknowledgement of the facts as they existed: Kalme was gone and would not be coming back.

539 F.2d at 1348–9. *Kalme* also forecloses any claim of a deprivation of a liberty interest. There is no viable claim for a deprivation of a liberty interest, because there was no evidence adduced at trial that there had been any publication of any of the "concerns" expressed to plaintiff about his teaching performance. Deprivation of liberty without due process of law in a dismissal situation requires a finding that defendants publicized facts or circumstances surrounding the dismissal of a public employee such as to damage his reputation or foreclose his freedom to take advantage of other employment opportunities. *Board of Regents v. Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707; *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); *Bunting v. City of Columbia,* 639 F.2d 1090 (4th Cir. 1981). In the instant case there was neither a dismissal, nor a publication of derogatory facts.

■ Plaintiff claims that he had a protectable property interest in his study leave

created by the regulations of the Faculty Study Leave Committee. It is true that an expectation created in regulations or common law can turn into a property interest requiring procedural protection. *Thomas v. Ward,* 529 F.2d 916, 919 (4th Cir. 1975). To have a property interest, however,

a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Plaintiff in the instant case did not have a legitimate claim of entitlement to the Title III study leave. His study plans were not in accord with the goals of the college for the Title III grants. Even though he might have thought that the courses he would take at Harvard would broaden his teaching capabilities, the school's goal was to increase its percentage of doctorates in his department. In addition, plaintiff had not obtained final approval of his study leave. He had nothing more than a unilateral expectation of the leave. Although the Board of Regents had approved the leave, the final word must come from the president of the college, and plaintiff had never been advised by Dr. Burnett that his study leave was authorized.

■ Even if, by some stretch of the imagination, this Court could find that plaintiff had some protected interest in the study leave, the numerous opportunities given him by the college to clarify his plans so that the leave could be approved was all the process he was due under the circumstances. He was afforded sufficient notice of the claim and an opportunity to be heard on the merits. *See Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

■ Plaintiff did not even attempt to prove any facts sufficient to support his claim under 42 U.S.C. § 1985(3). That section requires proof of a conspiracy to deprive someone of the equal protection of the laws and proof of some racial or class-based invidious discrimination. Plaintiff's bare

**992**

allegations that the college had it "in" for Africans is not sufficient. *See Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Atkins v. Lanning*, 415 F.Supp. 186 (N.D.Okl.1976), *aff'd*, 556 F.2d 485 (10th Cir. 1977).

The Court finds that plaintiff voluntarily relinquished his property interest in continued employment, that the college did not deprive him of a liberty interest without due process of law, and that he has not proved any violation of the equal protection clause. It is, therefore, this 10th day of May, 1982, by the United States District Court for the District of Maryland, ORDERED:

That judgment BE, and the same IS, hereby ENTERED in favor of the defendants.