12 F.3d 214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Danny THOMPSON, Sr., et al., Plaintiffs-Appellees, Cross-Appellants,
v.
The CITY OF HICKMAN, et al., Defendants-Appellants, Cross-Appellees.
 Nos. 92-6150, 92-6166.
 United States Court of Appeals, Sixth Circuit.
 Nov. 29, 1993.
 
 Before: MILBURN and NELSON, Circuit Judges, and GILMORE, Senior District Judge.*
 PER CURIAM.
 
 
 1
 This is a federal civil rights case that arises out of the allegedly selective enforcement of local zoning regulations and a state statute governing subdivisions. A jury found that the defendants had violated the constitutional rights of several landowners and a contractor who built houses on the property. Motions for judgment n.o.v. were overruled as to all but one of the defendants, and judgment was entered for the plaintiffs in the total amount of $65,000.
 
 
 2
 For the reasons stated below, we conclude that the plaintiffs were not entitled to go to the jury on any of their claims. We shall therefore reverse the judgment for the plaintiffs and affirm the judgment in favor of the prevailing defendant.
 
 
 3
 * A
 
 
 4
 Plaintiffs Joe and Carole Lattus, Jr., owned a 220-acre farm in Hickman, Kentucky. In 1989 the Lattuses began selling off portions of the farm as building lots. By the end of 1990 they had sold nine lots--seven to black people and two to a white man.
 
 
 5
 The seven black purchasers constructed houses on their lots without incident. Two subsequent black purchasers, Duane Smith and Teresa Wilkins, were in the process of building houses when defendants Susan Major (the chairperson of the Hickman Planning Commission), Judy Powell (the mayor of Hickman), and Frank Mosko (a community development consultant who occasionally worked for the city under contract) wrote a stop-work order for signature by Elmer Williams (Hickman's Building Inspector). This order directed that construction be stopped because the former Lattus farm constituted an illegal subdivision. The order was issued without a meeting of the full Planning Commission.
 
 
 6
 It is undisputed that the Lattuses had failed to prepare and file a subdivision plat, as required by Kentucky law,[1] prior to selling portions of their farm as building lots. The effect of such failure, under Ky.Rev.Stat. Sec. 100.277(2), is to render void any subsequent conveyance of lots within the subdivision.
 
 
 7
 Early in March of 1991 the Planning Commission held a public meeting to consider the status of the Lattus subdivision. This meeting attracted substantial public notice in the Hickman community. Ms. Major was quoted in the local paper as saying that because Sec. 100.277 had not been complied with, the occupants of the new houses were not the legal owners of their lots.
 
 
 8
 The Lattuses filed plats with the Commission in the wake of the March meeting. On May 6, 1991, after the plats had been reviewed by the Kentucky Department of Highways and various Hickman officials, the Commission held a public hearing at which it conditionally approved the plats.
 
 
 9
 The plats contemplated development of the subdivision in three stages. Phase I covered five houses already built and occupied and the lot on which the Smiths were building their house. The Commission conditioned approval of this phase on the granting of a utility easement by the Lattuses. Phase II consisted of two undeveloped lots owned by Richard Cagle, a white man, two lots with completed houses owned by plaintiffs McClerkin and Whitelow, and a lot owned by plaintiff Wilkins, whose house was under construction. Phase III included lots still owned by the Lattuses.
 
 
 10
 The utility easement upon which approval of Phase I was conditioned was already in existence. The Lattuses provided proof of the easement to the Commission in September of 1991, and the Commission thereupon approved the Phase I plat. Approval and filing of this plat rendered good the titles held by plaintiffs Kinney, Roberson, Cheers, Barnett, Mays and Smith.
 
 
 11
 The Commission conditioned approval of Phase II on the Lattuses' posting a $12,000 bond in favor of the City to assure payment for the extension of city utility services to each of the lots. Approval of Phase III was conditioned on the posting of a $70,000 bond for payment for city services and on the Lattuses' building an access road to the lots. The access road requirement was based on the recommendation of the police chief of Hickman. The chief noted that a traffic hazard would be created by Phase III as proposed, because this phase contemplated construction of fourteen homes along a sharply curved portion of a state highway where the speed limit was 55 miles an hour. The chief's recommendation reflected the views of the Kentucky Department of Highways.
 
 
 12
 The Lattuses did not post the bonds required for approval of Phases II and III. Construction was held up for more than a year on the lot owned by plaintiff Wilkins and, apparently, the Smith lot as well. None of the lots in Phase III has been sold, nor has any construction taken place on those lots.
 
 B
 
 13
 The Lattuses, the black purchasers, and Danny Thompson, the contractor who built all of the houses, brought an action against the City, the Planning Commission, Ms. Major, Ms. Powell and Mr. Mosko for alleged violations of 18 U.S.C. Secs. 1981, 1982, 1983 and 1985. The plaintiffs' theory was that the City's subdivision regulations and Ky.Rev.Stat. Sec. 100.277 had been enforced against the plaintiffs selectively because of racial animus. The development of the Lattus subdivision, they said, marked the first time black families had moved into a predominantly white section of town. The plaintiffs presented evidence at trial showing that two other subdivisions had been built in an area of Hickman predominantly inhabited by white people; that the homes in these subdivisions had been sold to white families; that these subdivisions were not in compliance with certain of Hickman's subdivision regulations; and that the City had taken no action to obtain compliance.
 
 
 14
 The plaintiffs also presented evidence that the appropriate remedy for violation of state or local zoning regulations was an injunction against further construction. The stop-work order was issued without counsel having been consulted about the remedy.
 
 
 15
 The evidence as to damages included testimony by Mrs. Lattus[2] that she and her husband had been unable to sell any more lots after issuance of the stop-work order and that profits of between $2,500 and $3,000 had been lost on each lot not sold. Danny Thompson, the builder, testified that he was unable to construct any more houses in the subdivision after issuance of the stop-work order, and he said that he lost profits of $1,000 to $7,500 per house. The plaintiffs who had built and occupied houses on lots purchased from the Lattuses testified that they were held up to public ridicule and humiliation. Mr. and Mrs. Smith and Ms. Wilkins, whose lots were the subject of the stop-work order, testified that they suffered damages by reason of a delay in the construction of their houses.
 
 
 16
 The jury returned a verdict in favor of the plaintiffs against Major, Powell, Mosko, the City, and the Planning Commission. Damages were assessed in the following amounts: $25,000 to Mrs. Lattus, $10,000 to Mr. Thompson, $5,000 to Ms. Wilkins, $2,500 each to plaintiffs Roberson, Cheers, McClerkin, Whitelow, Barnett, Kinney, Smith and Smith, and $1,250 each to Mr. Mayes and Ms. Taylor.
 
 
 17
 The district court entered judgment on the verdict, but subsequently granted Mr. Mosko's motion for judgment n.o.v. under Rule 50(b), Fed.R.Civ.P. Ms. Powell, Ms. Major, the City, and the Planning Commission have appealed from the judgment against them, and the plaintiffs have taken a cross-appeal from the judgment in favor of Mr. Mosko.
 
 II
 
 18
 Turning first to the case against Mr. Mosko, we note that each of the statutes at issue requires a showing of discriminatory intent. Murray v. Thistledown Racing Club, 770 F.2d 63, 69 (6th Cir.1985) (Sec. 1981); Beasley v. Metro. Gov't of Nashville and Davidson County, No. 83-5606 (6th Cir., Nov. 15, 1984) (unpublished) (Sec. 1982); Bourcier v. City of Manistee, 958 F.2d 371 (6th Cir.1992) (Sec. 1983 equal protection claim); Griffin v. Breckenridge, 403 U.S. 88, 103 (1971) (Sec. 1985). The plaintiffs made no such showing with respect to Mr. Mosko. There was no evidence that he knew anything about the plaintiffs' race at the time he was summoned to consult with the mayor and Ms. Major on the situation at the Lattus farm. Although the plaintiffs stress that Mr. Mosko did not seek a legal opinion before helping to draft the stop-work order, that he had never drafted a letter of that sort before, and that he was a "responsible" actor in the hierarchy of Hickman government, none of this is evidence of discriminatory intent.
 
 III
 
 19
 Next we consider the judgment in favor of plaintiffs Roberson, Cheers, McClerkin, Whitelow, Barnett, Mayes, Taylor, and Kinney--the people who were occupying completed houses as of February 12, 1991.
 
 
 20
 The standard we apply in reviewing a ruling on a post-judgment motion for judgment under Rule 50(b), Fed.R.Civ.P., is the same standard used by the district court when it considers a pre-judgment motion under Rule 50(a). The motion should be granted if, viewing the evidence in the light most favorable to the party against whom the motion is made and giving that party the benefit of all reasonable inferences, reasonable minds could come only to a conclusion in favor of the movant. Phelps v. Yale Security, Inc., 986 F.2d 1020, 1023 (6th Cir.), cert. denied, 114 S.Ct. 175 (1993).
 
 
 21
 When Ms. Major, Ms. Powell, and Mr. Mosko prepared the stop-work order and caused it to be issued, the Lattus subdivision was not in compliance with Ky.Rev.Stat. Sec. 100.277. Subdivision plats had neither been approved by the Planning Commission nor recorded at the county clerk's office, as required by Sec. 100.277. The effect of the failure to record was to render it impossible for the Lattuses or anyone else to make any "transfer, sale or contract" of land within the putative subdivision. Under Kentucky law, these plaintiffs did not own their houses and lots; they simply had a potential lawsuit against the Lattuses. See Ky.Rev.Stat. Sec. 100.277(2).
 
 
 22
 Sections 1981-1983 and 1985 of U.S. Code Title 18 require that a plaintiff prove that he or she suffered the deprivation of a legal right, privilege or immunity at the hands of the defendant. "Where an alleged act of discrimination does not involve the impairment of one of these specific rights," the statutes provide no relief. Patterson v. McLean Credit Union, 491 U.S. 164, 176 (1989).
 
 
 23
 The "specific rights" alleged to have been infringed here were the rights of the plaintiffs to hold and transfer real property, to make and enforce contracts, and to receive equal protection of the laws. But no action was required of the City of Hickman to nullify the plaintiffs' ownership interests in their homes; the transfers from the Lattuses were void ab initio. Section 100.277 is by its terms a self-executing law, so there can be no question of its selective enforcement by the defendants. See First Nat'l Bank & Trust v. Carr Building, Inc., No. 90-CA-002380, 1992 WL 51223, 1992 Ky.App. LEXIS 39 (Ky.App., Mar. 20, 1992) (holding mortgage over lots in unrecorded subdivision void under Sec. 100.277).
 
 
 24
 The defendants contend--correctly, we think--that instead of harming these individual homeowners, the actions of the City and its agents set in motion the process through which their titles were ultimately cleared. See Ky.Rev.Stat. Sec. 100.277(3) (subsequent approval and recordation of unrecorded plat validates prior transfers). Rather than interfering with the constitutional right of the plaintiffs to buy and sell land, the actions of the appellants vindicated those rights.
 
 
 25
 These plaintiffs also argued at trial that the selective enforcement of Hickman's subdivision regulations (apart from Ky.Rev.Stat. Sec. 100.277) against the Lattus subdivision gave rise to claims under the civil rights laws. Again, however, the record fails to reveal any legal entitlement that was taken away by enforcement of the subdivision regulations.
 
 
 26
 When they speak of "enforcement of the Subdivision Regulations," we take it that the plaintiffs refer to the Planning Commission's conditioning approval of the plats on the granting of easements, the posting of bonds and the construction of a roadway. But these commands of the Planning Commission were not directed to the people who had already purchased land and built and occupied houses; the commands were directed to the Lattuses and had no bearing on the financial or legal position of the group now under discussion.
 
 
 27
 Because Ky.Rev.Stat. Sec. 100.277 was not selectively enforced against them and because the defendants did not abridge their rights to contract or to hold and convey real property, we hold that plaintiffs Roberson, Cheers, McClerkin, Whitelow, Barnett, Mayes, Taylor, and Kinney were not subjected to any deprivation of a legal right by the defendants. These plaintiffs failed to make out a prima facie case of violation of Secs. 1981-83 or 1985, and the motion for judgment against them ought to have been granted.
 
 IV
 
 28
 We turn finally to the defendants' contention that the trial court should have granted their motion for judgment n.o.v. against the Lattuses, Danny Thompson, the Smiths, and Teresa Wilkins. At trial this group of plaintiffs likewise argued that their civil rights had been violated by the City's selective enforcement of Ky.Rev.Stat. Sec. 100.277 and the subdivision regulations. As discussed above, however, we have concluded that the City could not have enforced Sec. 100.277 selectively; the law is self-executing. What remains to be considered is the claim that the City selectively enforced the local subdivision regulations against this group of plaintiffs.
 
 
 29
 Under the local regulations, the Commission conditioned approval of the plats for Phases II and III on the Lattuses' posting bonds totalling more than $80,000 and agreeing to pay for the construction of an access road. The plaintiffs argued that the imposition of the conditions made completion of the planned development economically unfeasible. The plaintiffs correctly note that a claim of selective enforcement requires more than a showing that the laws in question were not applied with absolute uniformity. Rather, one claiming selective enforcement must prove that he was treated differently than others similarly situated and that the differing treatment arose from intentional and illegal discrimination. Oyler v. Boles, 368 U.S. 448, 456 (1962); United States v. Bustamonte, 805 F.2d 201 (6th Cir.1986).
 
 
 30
 It is conceded here that the City had the legal authority to require the posting of bonds to assure payment for the extension of city services to new subdivisions. Cf. Ky.Rev.Stat. Sec. 100.281(4); City of Hickman Subdivision Regulation (o) ("Prior to construction, the Commission may request a surety instrument from the subdivider to ensure that the subdivision will be developed in compliance with the City's Subdivision Regulations"). The question, then, is whether the City required those "similarly situated"--other subdividers--to post security for the payment of necessary services by the City to the subdivisions. We have searched the record in vain for any proof as to whether prior subdividers (there were at least three) were or were not required to post bonds similar to those required from Mrs. Lattus.
 
 
 31
 Throughout the trial the plaintiffs offered generalized testimony to the effect that zoning and subdivision regulations were not regularly enforced by Hickman and its officers. When the testimony was specific, however, it related only to the City's alleged nonenforcement of certain regulations (other than Subdivision Regulation (o)) as they pertained to existing subdivisions. The plaintiffs offered no evidence as to the City's earlier practice on occasions when a subdivider presented plats for approval prior to creation of a new subdivision. The defendants, on the other hand, presented evidence showing that it was the City's usual practice to require subdividers to pay for the extension of city utility services to new subdivisions.
 
 
 32
 The prime example of "selective enforcement" cited by the plaintiffs relates to a development known as the Amberg subdivision. In our view, the story of the Amberg subdivision tends to prove the City's claim that the financial burdens imposed on the Lattus subdivision were in no way unusual. A plat for the Amberg subdivision, bearing the Planning Commission's stamp of approval, was recorded by the county clerk. The City required the Amberg developer to pay for the extension of utilities and other improvements into the subdivision. The developer failed to complete one of the required improvements, a paved access road. Upon discovering that the road had not been completed, the City advised the developer that the City would not pay for the road, that the City would not accept dedication of the road until it was properly paved, and that the City would issue no further building permits for the subdivision until the road was completed. The City thus treated the Amberg and Lattus developments essentially the same.
 
 
 33
 The judgment in favor of defendant Mosko is AFFIRMED. The judgment in favor of the plaintiffs is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of the remaining defendants.
 
 
 34
 GILMORE, Senior District Judge, concurring in part and dissenting in part.
 
 
 35
 I concur in that portion of the majority's opinion which affirms the judgment in favor of defendant Mosko. I cannot, however, agree with the majority's decision to reverse the trial court's judgment in favor of the plaintiffs as against the remaining defendants.
 
 
 36
 After reviewing the record in the court below, I agree with Judge Johnston that the trial record contains evidence from which a reasonable jury could find that the defendants administered the City of Hickman subdivision regulations unequally and in a racially suspect manner, to the plaintiffs' detriment.[1] For example, I find it ironic to note that although defendants never contacted the plaintiffs to advise them about the plat problems, defendants nevertheless took it upon themselves to contact plaintiffs' mortgage lender and advise it that plaintiffs' deeds were void. While defendants assert that they only contacted the lender to allay and possible concerns, the chronology of events belies their benign justifications. Moreover, defendants only contacted the one lender that had been involved in arranging financing for the black homeowners; the lender that had financed a white homeowner's purchase was not similarly and needlessly alarmed.
 
 
 37
 For the foregoing reasons, I would affirm the judgment of the District Court with respect to defendants City of Hickman, the Hickman Planning Commission, Judy Powell, and Susan Major.
 
 
 
 *
 The Honorable Horace W. Gilmore, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Kentucky law defines a "subdivision" as the division of a parcel of land into three or more lots or parcels. Ky.Rev.Stat. Sec. 100.111(22)
 Ky.Rev.Stat. Sec. 100.277 provides as follows:
 "All subdivision of land shall receive commission approval;
 (1) No person or his agent shall subdivide any land, before securing the approval of the planning commission of a plat designating the areas to be subdivided, and no plat of a subdivision of land ... shall be recorded by the county clerk until the plat has been approved by the commission and the approval entered thereon in writing by the chairman, secretary, or other duly authorized officer of the commission.
 (2) No person owning land composing a subdivision, or his agent, shall transfer or sell any lot or parcel of land located within a subdivision by reference to, or by exhibition, or by any other use of a plat of such subdivision, before such plat has received final approval of the planning commission and has been recorded. Any such instrument of transfer or sale shall be void and shall not be subject to be recorded ... but all rights of such purchaser to damages are hereby preserved...."
 "Commission," as used in Ky.Rev.Stat. Sec. 100.277, refers in this instance to the Hickman Planning Commission. Ky.Rev.Stat. Sec. 100.111(5).
 
 
 [2]
 Joe Lattus, Jr. died after the lawsuit was filed, but before trial
 
 
 [1]
 Although the majority correctly states that the record contains no evidence that other developers failed to comply with the regulation requiring the filing of a subdivision plat, there is evidence that developers had violated other subdivision regulations and that those violations went unenforced