Rajeshwar Singh YADAV, Plaintiff,

v.

**BROOKHAVEN NATIONAL LABORA-
TORY;  and Brookhaven Science
Associates, Defendants.**

No.  99 CV 5602(ADS).

United States District Court,
E.D. New York.

May 31, 2002.

---

Rajeshwar   Singh   Yadav,   Princeton
Junction, NJ, Pro Se.

Seyfarth,  Shaw,  New  York,  NY,  By
Lynn Kappelman, Devjani Mishra, for De-
fendants.

### MEMORANDUM OF DECISION
### AND ORDER

SPATT, District Judge.

The plaintiff, an individual of Indian ori-
gin, commenced this action against his em-
ployer, defendant Brookhaven National
Laboratory ("BNL") and Brookhaven Sci-
ence Associates ("BSA"), alleging that he
was denied promotion and subjected to
unequal terms and conditions of employ-
ment based upon his race and national

origin in violation of 42 U.S.C. § 1981. The plaintiff is an architect who was born in Delhi, India and obtained a Bachelor's degree in Architecture in Delhi and a Master's degree in Architecture in the United States.

Two defense motions are presently before the Court. (1) a motion for summary judgment pursuant to Fed. R. Civ. 56 and (2) a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 50, at the conclusion of the evidence at the trial. Unlike at the summary judgment stage, the Court now has the benefit of having received all of the evidence, including the testimony and the exhibits.

## I. *THE PLAINTIFF'S CONTENTIONS*

Giving the plaintiff the benefit of all reasonable inferences, the plaintiff's five complaints of race and national origin discrimination are: (1) he was not promoted to the job of manager of the Management System Improvement Program "(MSIP)"; (2) his salary was not commensurate with non-Indian supervisors in the P–9 classification; (3) his office was moved into an inconvenient cubicle; (4) he was harassed and humiliated while on the job, because of his Indian heritage; and (5) of the three Indian employees in the Plant Engineering Division, one, Bal Patel, was terminated in 1994, the second, Swapna Mukherji, was demoted and the third, the plaintiff, was discriminated against as set forth above in the first four contentions.

## II. *DISCUSSION*

In addressing the present motion, the Court again is mindful that the plaintiff is proceeding *pro se* and that his submission should be held to less stringent standards than lawyers. *See Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)); *see also Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir.1993); *Kielhurn v. Giammarinaro*, 148

F.Supp.2d 219, 227 (E.D.N.Y.2001). The Court recognizes that it must make reasonable allowances so that the *pro se* plaintiff does not forfeit rights by virtue of his lack of legal training. *See Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir.1983). Although, the Court notes that the plaintiff has shown remarkable knowledge of the law. Nevertheless, the Court is also aware that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...." *Traguth*, 710 F.2d at 95 (citation omitted).

The defendants are moving, at the conclusion of the entire case, both for summary judgment dismissing the complaint pursuant to Fed.R.Civ.P. 56 and for judgment as a matter of law, pursuant to Rule 50(a)(1).

Rule 50 provides in relevant part as follows:

(a) Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

A court decides a motion for judgment as a matter of law under Fed.R.Civ.P. 50(a)(1) using the same standard that applies to motions for summary judgment. *See Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111 (2d Cir.2000), but at a different stage; after the evidence is in. As stated recently by the United States Supreme Court in *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000),

Rule 50 requires a court to render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ... The standard granting summary judgment "mirrors" the standard for judgement as a matter of law, such that "the inquiry under each is the same ..." It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses'.

530 U.S. at 149–151, 120 S.Ct. at 2109–10 (citations omitted). Stated differently,

[O]n a motion for a judgment as a matter of law after a jury verdict, or on appeal after trial, the question is always whether, after 'drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.' 'Sir Speedy, Inc. v. L & P Graphics Inc., 957 F.2d 1033, 1039 (2d Cir.1992); see also Liberty Lobby, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 ("[T]he judge must ask ...

whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented [,] ... whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. ..."); Hollander v. American Cyanamid Co., 172 F.3d 192, 200 (2d Cir.1999) (standard to grant summary judgment is whether there is "sufficient evidence for a reasonable jury to conclude that [defendant] discriminated.")

McCarthy v. New York City Technical College, 202 F.3d 161(2d Cir.2000).

### A. The Statute—Section 1981

This claim is based upon 42 U.S.C. § 1981. That statute provides:

All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, ... as is enjoyed by white citizens ... (emphasis added)

Section 1981 guarantees each person, regardless of race or national origin, freedom from discrimination in the making and enforcing of contracts, including employment agreements at will. The opportunity to contract or enter into agreements, is denied in violation of Section 1981 when, on the basis of race or national origin, a defendant refuses to contract at all or when, on the basis of race or national origin, it varies the terms of its offers or acceptances to contract. If, because of race or national origin, a plaintiff is denied the right to contract entirely, or is given less opportunity to contract, or is offered less favorable contractual terms or unequal treatment he has a claim under Section 1981.

To establish a claim under Section 1981, the plaintiff Yadav must prove, by a preponderance of the evidence, that the conduct of the defendants' employees in the various adverse employment decisions the

plaintiff is complaining of were motivated by a discriminatory purpose—that is, the plaintiff must prove that the defendants' employees intentionally and purposefully discriminated against him because of his race and Indian national origin; that is, that the race and Indian national origin of the plaintiff Rajeshwar Yadav was a motivating factor in the defendants' conduct with regard to the adverse employment decisions he complains of.

In determining whether the defendants intentionally discriminated on the basis of the plaintiff's Indian national origin, the Court must consider all the evidence presented in the case, both direct and circumstantial evidence.

The Court must analyze this case under the Section 1981 standards set forth in *Mian v. Donaldson,* 7 F.3d 1085, 1087 (2d Cir.1993), as follows:

> To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts). *See, e.g., Baker v. McDonald's Corp.,* 686 F.Supp. 1474, 1481 (S.D.Fla.1987), *aff'd* 865 F.2d 1272 (11th Cir.1988), *cert. denied,* 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

In this case, the plaintiff is a member of a racial minority and the alleged discrimination concerns activities in the statute. However, after reviewing all the evidence and drawing all reasonable inferences in favor of the plaintiff and making all credibility assessments in his favor, the plaintiff has failed to prove intentional racial or Indian national origin discrimination. In addition, the Court finds that, as to the failure to promote claim, the defendants have presented a legitimate, non-discriminatory reason, which is impervious to attack, as a matter of law. Also, the Court finds that many of the plaintiff's assertions of racial and Indian national origin discrimination are based on conclusory allegations and speculation, conjecture and surmise. *See Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). In the Court's view, there are no viable triable issues for the jury in this case.

## B. *The Trial—Overview*

The Brookhaven National Laboratory was formerly a World War II facility known as Camp Upton, with wooden barracks and buildings. The Brookhaven National Laboratory has been operated by the defendant Brookhaven Science Associates since 1998. The BNL is owned by the United States Department of Energy. The Brookhaven National Laboratory is a small city covering 6000 acres, 400 buildings, 3300 miles of road and 3000 employees. BNL has its own post office, zip code, police department, fire department and golf course.

The Plant Engineering Division at BNL as reconstituted in 1994, consists of four main groups: (1) Engineering and Constructions Services ("ECS"), in which Michael Schaeffer is the Manager; (2) Infrastructure Management ("IM"), in which Thomas Timko is Manager, John DiNicola is the Master Planner and the plaintiff is Supervisor; (3) Operation and Maintenance, with Alanson Warren as the Manager; and (4) Energy Management with G. Channey as Manager. For the purposes of this discussion, the ECS group did the engineering and construction on the buildings in the BNL, and the IM group did the early planning for the engineering and construction and other early planning.

Michael Schaeffer, the Manager of ECS Group, testified that all four groups report to Edward Murphy who is the Plant Engi-

neer Division Manager. The overall Director of the Plant Engineering Division, in total command of the Division, is Michael Bebon. Schaeffer commenced work in the BNL in April, 1978. The plaintiff does not work in Schaeffer's group. Schaeffer testified that he is in charge of the Architectural Review Committee dealing with certain issues at BNL, including signage problems. The proof is clear that the plaintiff never asked to be a member of this committee, nor is there any pecuniary or other advantage to being assigned to the Architectural Review Committee.

John DiNicola is a master electrical engineer and a licensed professional engineer. He is the Master Planner in the IM Group, and is the plaintiff's immediate superior. On the organizational chart, DiNicola is under Thomas Timko, who is the Manager of the IM. The hierarchy at the Plant Engineering Division, insofar as the plaintiff is concerned, from the top down, is Bebon, Murphy, Timko, DiNicola and Yadav. DiNicola testified that the plaintiff is a good negotiator but needs improvement in personal skills. He related that three persons made complaints about the plaintiff. Also, according to DiNicola, a number of people in the BNL indicated that they did not want to work for Yadav.

In response to a question by Yadav, DiNicola stated that Yadav was not qualified to be a master planner because he has difficulty working with people and makes promises or commitments he cannot meet. (Tr. at 468–69). In addition, DiNicola testified that Yadav is not qualified to manage the demolition of a building. Also, DiNicola expressed reservations about whether the plaintiff is a "competent and qualified supervisor." DiNicola wrote the plaintiff's Performance Evaluations and, generally, he rated him as an effective employee. Also, the plaintiff was occasionally rated as

distinguished and also as an adequate performer.

Thomas Timko, the Manager of the IM Group, testified that Yadav was a mostly effective and sometimes a highly effective employee. He described work that Yadav had done in his Group which was very commendable. On one occasion, Timko sent Michael Bebon an email giving "Raj" full credit for a particular idea and Bebon responded, "Great idea, great idea by Raj." On another occasion, Timko wanted to give Yadav a Brookhaven award, but found that P–9s were not eligible for that award.

The plaintiff conceded that, except in his conversations with other Indians, he never heard anyone at Brookhaven make derogatory remarks about Indians.

Q Are you suggesting other people of your national origin have said derogatory things about Indians?

A No. I am saying other people have related their experiences to me.

Q I am not talking about other people's experiences. I am talking about your experiences and what you heard. Is the answer you gave two weeks ago still correct today that you never heard anyone else at Brookhaven make derogatory comments about Indians, you personally, sir?

A I personally did not hear any negative comments from other people except my conversation with Indians.

Tr. at 784.*

Edward Murphy is the Manager of Plant Engineering at BNL, the second in command of the Division. During the course of the years of working with the plaintiff, Murphy has had occasion to discuss his performance with him. One such occasion occurred on November 19, 1998,

* Tr. refers to the trial transcript.

when Yadav threw a tantrum in Murphy's office and yelled at him for 20 minutes. Murphy felt compelled to note his disapproval in a written memorandum dated November 20, 1998 (Dft.Ex.H).

DATE:     November 20, 1998

TO:       R. Yadav

FROM:     E.T. Murphy

SUBJECT:  Your Work Performance and Teamwork

I was extremely disappointed in the behavior you exhibited in my office yesterday.

I called a meeting yesterday afternoon to pull together our project team and discuss the major space upgrades and departmental moves that Plant Engineering is responsible for carrying out this year. (You did much of the preliminary planning work for this effort.)

\* \* \* \*

After the meeting, you came into my office and threw a tantrum. Although I tried to calm you down and talk with you in an appropriate manner, you persisted in yelling at me for over 20 minutes. I've tolerated this behavior from you in the past, but it is inappropriate and it must stop.

You indicated that you were personally insulted by my assignment of Mr. Dyling to manage this project. I told you that important, major projects are best carried out by teams of talented people. I told you that you were an important part of the team we've assembled—due to your planning and space management skills. I told you that you had no reason to feel insulted or slighted by my need to assign additional people to the project—now that it is funded and proceeding under tight schedule constraints. Detailed project management is *not* your normal job responsibility.

You responded by telling me that you "are just a peon" and were going to, in effect, conduct a work slowdown—that you would only do what you are directed to do by management. I told you that is unacceptable behavior.

You are to continue your skills to the project team; perform at your appropriate professional level (project engineer and supervisor); and help make this project a success. *I also told you that if you plan to do less, you should resign now.*

I expect nothing less than professional contributions and teamwork from you. We have talked in the past *at length* about your performance re these issues. While you've alleged in the past that these performance issues are due to some kind of personal discrimination, I strongly believe that is not the root cause. You have not learned to work well with others in a group or team. Your outburst yesterday demonstrated that again.

Teamwork is key to the kind of work we do.

If your performance and attitude do not improve immediately, I will pursue stronger disciplinary action.

ETM

Pressed by the plaintiff on cross-examination to explain his work at BNL, Murphy responded:

Q   Could you explain to me, sir, what I could have done better to make people move?

A One thing I thought you could have done better is work better with people. One of the things that we have consistently dealt with is a tendency when you work with people that you are demanding of them, you leave them angry. I frequently and periodically received phone calls that they are unhappy with having to deal with you. They request to deal with other people. On occasion I have had requests why are you in the job you are in? Because people don't

want to move anyway, and having to deal with people who are difficult makes it more stressful.

Tr. at 1097.

### C. *As to the Other Two Indian Employees in the Plant Engineering Division*

A major part of the plaintiff's complaint is that all three of the Indian employees at the Plant Engineering Division suffered from national origin discrimination. The three Indian employees in the Plant Engineering Division were the plaintiff, Bal Patel and Swapna Mukherji.

### (1) Swapna Mukherji

Swapna Mukherji testified that she attained Bachelor's and Master's degrees in engineering in Calcutta, India. She joined BNL in 1984. She is a project coordinator in the ECS Group headed by Schaeffer. According to Schaeffer, she was made a project coordinator in his group "which was equal or perhaps higher than a supervisor." (Tr. at 226).

In many aspects, Mukherji did not support the plaintiff's position in this Indian national origin discrimination case:

Q Have you been humiliated by Peter Boyke, Tom Nehring, N E H R I N G, it is not on that list, because he is no longer there, and I will give you correct spelling, and it was during your employment at BNL?

A I don't think so.

Q Is it true that Bebon—I am sorry, Mr. Bebon does not even recognize you in meetings and he knows you not recently but a few years back?

A No.

Q Based on your observation over the years, would you agree that Mr. Bebon prefers to be with white people only?

A Most of the people who work there are white, so I do not know what his preference is.

Q Is it true that sometimes you cried at home because of your humiliation at work?

A No.

Q Is it true that you had told me that once between me and yourself?

A No.

Q Is it true that you have resigned to the fact that you have to accept this treatment because you had to do the job?

A I do not understand your question no.

Q Would you agree that neither I nor you are treated with respect by others in general?

A I don't know about you. I'm fine.

Tr. at 330–31.

Mukherji testified that in 1995 she was eliminated as a supervisor and her title was changed to project coordinator. She stated that she did not know if the title of supervisor is higher than that of project coordinator. However, she further stated that project coordinator was "one step below" in the management structure; and that was true in the plaintiff's case as well.

However, with her memory refreshed by being shown notes made by Human Resources Manager Susan Foster on October 10, 1995, Mukherji testified about that interview. She stated that she did believe that there is discrimination in the Plant Engineering Division. Her belief was based on the treatment by management of the plaintiff, but primarily because of his "office move." However, significantly, Mukherji, a fellow Indian in the Plant Engineering Division, on the witness stand stated, in substance, that she was never subjected to discrimination.

Q Ms. Mukherji, did you tell Ms. Foster that you believe that there is discrimination in the plant engineering division?

A I did.

Q Did you base your belief on the treatment by management of Mr. Yadav, primarily his office move?

A Yes.

Q Did you believe that Mr. Yadav is an intelligent person and does not receive appropriate respect?

A Yes, I did.

Q Did you also cite the termination of Mr. Patel and his subsequent replacement of Mr. Javid Far, F A R?

A I probably did. I don't recall that very well, but I probably did.

Q Did you also say that the recent changes in your responsibility and elimination of your supervisory duties was a cause of discrimination in the engineering plant?

A I don't believe I said that.

When I was low, I was depressed, but I never brought up discrimination—

THE COURT: I'm sorry, I didn't hear what you said.

THE WITNESS: I never brought any reason for discrimination for my change of responsibility.

MR. YADAV: Can I clarify something, your Honor?

THE COURT: Sure.

MR. YADAV: Maybe I did not phrase it right.

BY MR. YADAV:

Q What it says, basically, when you reached a conclusion that—when you reached the conclusion in your own mind that there is discrimination in the plant engineering, was that also one of the considerations when you were thinking about that, that your responsibilities and your elimination of your supervisory duties is also one of the causes?

A No, I never put myself in discrimination. I never cited myself as a person who has been discriminated.

Tr. at 377–78.

In addition, Mukherji testified that her transfer in position from a supervisor to a project coordinator was not a demotion.

Q Right.

I believe you testified earlier about the fact that you were moved into the project coordination role from the supervisor's role; is that correct?

A Yes.

Q And there was not an attendant decrease in salary?

A No.

Q And in fact, there was not a demotion?

A No.

Q In fact, project coordinators have gone on to become managers of the engineering and construction service group?

A Yes, except I had my level of the people I was reporting to—I was directly reporting to the manager, and now I have another manager in between. That was the only difference.

Q The only difference is there was an additional level of management?

A Management, yes.

Tr. at 387–88.

Mukherji also testified that she formerly worked for Tom Timko and John DiNicola, the plaintiff's managers, and they never discriminated against her on the basis of her national origin; nor had the two top managers, Edward Murphy and Michael Bebon.

Q And you do not work for Mr. Timko or Mr. DiNicola at the present time?

A No.

Q Those are Mr. Yadav's managers now?

A Right.

Q But in fact you did work for both of them at different periods of time; is that correct?

A That's correct.

Q Would you agree with me that Mr. Timko has never discriminated against you on the basis of your national origin?

A That's correct.

Q And he's never harassed you on the basis of your Indian national origin?

A That's correct.

\* \* \* \*

Q And Mr. DiNicola has never discriminated against you?

A That's correct.

Q And Mr. Timko never discriminated against you?

A That's correct.

Q And Mr. Murphy has never discriminated against you?

A Yes.

Q And Mr. Bebon has never discriminated against you on the basis of your national origin?

A That's correct.

Tr. at 389–90.

Susan Foster of BNL Human Resources Division took notes of an interview with Mukherji on October 10, 1995. Foster's desk notes revealed the following:

Finally, Ms. Mukherji believes that there is discrimination in the Plant Engineering Division. She bases her belief on the treatment by management of Mr. Yadav: primarily his office move. She believes that Mr. Yadav is an intelligent person and does not receive the appropriate respect. She also cites the termination of Mr. Patel and his subsequent replacement by Mr. Javidfar, in addition, the recent changes in her responsibilities and the elimination of her supervisory duties. (Plf.Ex.8).

With regard to this interview, the Court notes that it occurred in 1995, two years before the promotional decision cited by the plaintiff. In addition, the Court also notes that Mukherji "bases her belief on the treatment by management of Mr. Yadav, primarily his office move." As will be seen later in this decision, the 1995 cubicle move, even if not barred by the statute of limitations, cannot be the basis for a Section 1981 national origin discrimination claim. Being moved from one area to another, is not an actionable adverse employment decision, as a matter of law. (See *infra Part II E*)

In his direct examination of Thomas Timko, the plaintiff questioned him as to whether Mukherji's voice was annoying and whether she was not promoted because of her voice. Timko stated that he seriously doubted that and in fact, was of the opinion that she was "a very capable engineer" and that at one time he promoted her:

Q And you were also just asked some questions about Swapna Mukherji?

A That's correct.

Q You worked with Ms. Mukherji at one time, didn't you?

A She worked for me, yes.

Q And in fact, you yourself promoted Ms. Mukherji at one time, didn't you?

A I promoted her to supervisor position.

Tr. at 604.

The unrefuted proof established that Swapna Mukherji was laterally transferred and made a project coordinator but suffered no decrease in salary. In fact, as set forth in the salary graph (Def.Ex.I), of twenty-two P 9s, she is the fifth from the highest salary achieved, namely, $90,300 per year.

Mukherji also testified that both of her children and the plaintiff's daughter were

awarded college scholarships, funded by BSA.

### (2) Bal Patel

Michael Schaeffer, Manager of ECS, testified that in 1994 there were three supervisors of Indian descent in the Plant Engineering Division: Bal Patel, Swapna Mukherji and the plaintiff. Schaeffer testified that in June or July 1994 he laid off about 15 people, including Bal Patel. The plaintiff testified that only 8 people were laid off. The Court accepts the plaintiff's version. However, Bal Patel and the other employees, all Caucasians, were laid off in 1994 based on a reduction in force. The Court notes that neither the plaintiff nor Mukherji were involved in that reduction in force. That these employees were discharged because of a reduction in force at the BNL is unrefuted.

A reduction in force, based on neutral factors having nothing to do with national origin, can be a valid non-discriminatory reason to terminate an employee. *See Woroski v. Nashua Corp.,* 31 F.3d 105, 109, 110 (2d Cir.1994).

### D. *As to the Plaintiff's Claim Involving the Failure to Promote Him to the Position of Manager of the Management System Improvement Program*

In January 1997, the Management System Improvement Plan ("MSIP") was initiated. It has since been renamed the Office of Management Services. There had been a tritium leak, which is a radiological release into the ground. Schaeffer testified as to the MSIP and the tritium leak:

> THE COURT: How do you spell that?
> THE WITNESS: T R I T I U M, I am a terrible speller.
> THE COURT: What is that?
> THE WITNESS: A radiological release into the—into the ground.

So, Mike Bebon had asked myself and probably others to talk to our architectural engineering firms and our contacts to see if we can find someone that has experience in reactors, experience in cost and schedule controls and things of that nature, because he wanted to establish a small group, this Management Systems Improvement Program. And he started looking. And I forget who found, but a gentleman by the name of Steve Maloney from the New York Power Authority, It might have been Mike Bebon himself. He was brought in, because one of the first projects that this MIC group would be involved in would be in the tritium remediation project.

We posted an ad in our laboratory newspaper. I don't know if we also posted an ad in local newspapers.

I believe there was a committee formed, applications and resumes were requested under the normal progress of how we hire. And Steve Maloney rose as the best candidate. I was not involved in direct hires, so I don't recall exactly.

\* \* \* \*

We were also hoping that after all the dust had settled and the tritium was cleaned up, we didn't really know how extensive the tritium leak had been. There was also the project called the react restart. Because after the leak of the tritium our reactor, I believe it was down anyway, but it certainly wasn't operation. But we had aspirations of restarting the reactor down the road.

So, Steve Maloney was involved in that project.

The leak and all the ramifications and the public concerns were far greater than he had anticipated. And the reactor ultimately and is permanently closed.

* * * *

Steve Maloney is a good cost and scheduling expert and has good project management skills.

The MSIP group was maturing. Brookhaven Science Associates now took over the laboratory management away from this Associated Universities, Inc. They came on board in 1998.

Tr. at 296–98.

On the question of the MSIP managerial opening in 1997, there is an issue with regard to why the plaintiff never submitted an updated résumé which he was required to do. After he filled out the required transfer request form, the plaintiff testified that he asked Marsha Kipperman at Human Resources to attach a résumé from a prior application. Kipperman remembers this situation somewhat differently, in that she testified that she advised the plaintiff that, in addition to the transfer request form, he was required to furnish an up-to-date résumé. It is unrefuted that the plaintiff failed to fully complete the transfer request form and he also failed to furnish a *current* résumé.

In any event, the Court need not consider this factual issue, because it finds, from the clear and undisputed evidence, that there was a non-discriminatory reason to hire Stephen Maloney as the MSIP Manager. The position arose as a result of a tritium leak at the facility. Maloney had extensive experience with the New York Power Authority and the Long Island Power Authority in safety and environmental issues. In this new position, safety and environmental concerns were paramount. The Court finds that even if he had properly applied for the position, the compelling environmental reasons for the selection of Maloney constituted a non-discriminatory decision, as a matter of law.

Yadav's contention that he was entitled to an interview is without merit. He did not even complete the required transfer request form. More importantly, Maloney was so clearly more qualified in the field of safety and environmental concerns, that an interview with Yadav would have been a futile gesture.

Early in 1997, the Department of Energy conducted a safety evaluation of the Brookhaven facility and issued a report. The report revealed that there was a radiation leak that raised concerns. This was a tritium leak. As a result, the MSIP was designed to establish an integrated safety management program to insure that radiation leaks, like the tritium leak in early 1997, did not occur again. The BNL hired Maloney because of his experience with Three Mile Island and the decommissioning of the Shoreham nuclear power plant. In fact, the memorandum explaining the new program emphasized that it directly involved ES & H, which is BNL parlance for environmental safety and health.

Maloney's experience in the field of nuclear power plants and radiation leak prevention is extensive. In his first job at the Bechtel Power Corp., he was assigned to the standard nuclear unit power plant system. His next assignment was at Three Mile Island, working in the damaged reactor. He was at the Three Mile Island facility for three and a half years. His next employer was the New York Power Authority, working at the Indian Point Power Plant. Following that assignment, Maloney was one of eight persons assigned to develop a plan and perform the Shoreham nuclear plant decommissioning. This job at Shoreham took 28 months. Maloney was the last power person at the site. "I was there actually from cradle to grave for the entire operation." (Tr. at 935).

It is also interesting to note that the plaintiff has not applied for any other open position at BNL since July 1997. On the subject of promotions, Schaeffer testified without refutation, that the plaintiff never

applied for Martin Fallier's managerial position, and, in fact, never applied for any position in the Engineering Construction Services Group. In addition, although at the trial the plaintiff complained that he was not made a member of the Architectural Review Committee, Timko testified that the plaintiff never requested to be on that committee and there was never any intent to exclude him.

It is Yadav's perception that the only reason "all these actions" that are taken by different people and management, "is because I'm Indian." He stated that he "sensed" a general perception that they don't want to work with or under an Indian. Yadav's perception, unsupported by any direct or circumstantial evidence, is insufficient. As the Second Circuit repeatedly advised us, belief, speculation or surmise is not a basis for an employment discrimination charge. *See, e.g. Goenaga v. March of Dimes*, 51 F.3d 14 (2d Cir. 1995) (holding that the plaintiff cannot meet his burden on unsupported assertions, conjecture, surmise or speculative assertions).

### E. *As to the Cubicle Move*

■ One of the plaintiff's contentions as to national origin discrimination is that he was forced to move out of his supervisor's cubicle in June 1994. Initially, the Court finds that this claim is barred by the statute of limitations. However, on the merits, to complete the record, the plaintiff contends that, at some time, he had to sit on boxes in his new cubicle. This contention cannot support a Section 1981 discrimination claim. It is clear from the unrefuted evidence that the plaintiff's move was to relocate him to his proper group, rather than in the ECS group area. Mukherji also testified on this subject:

Q Now your knowledge—you talked briefly about Mr. Yadav's cubicle move, the office issue, when we were talking about that Susan Foster memo?

A I thought that was unfair.

Q And you were not making any decisions about that cubicle move, correct?

A No.

* * * *

BY MS. KAPPELMAN:

Q And no one ever told you, Ms. Mukherji, the reason that Mr. Yadav was asked to move, did they?

A No.

Q And you didn't talk to any of Mr. Yadav's managers about his treatment, did you?

A No.

Q So the only thing that you know about that cubicle move in 1995 was what you saw and what you talked to Mr. Yadav himself about, right?

A That's correct.

Q Okay. So you sort of had the impression through his eyes and through watching him and seeing him in the cubicle for a longer period than you thought he should be?

A I was there. My office was there.

Q You would agree, despite the delay, Mr. Yadav was ultimately moved into a larger office that was fixed up for him?

A Yes.

Tr. at 388–89.

The Court finds that, as a matter of law, the cubicle argument cannot support a Section 1981 national origin claim. In defining what constitutes an "adverse employment action," the Second Circuit observes that "not every unpleasant matter short of discharge or demotion creates a cause of action" for discrimination or retaliation. *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 446 (2d Cir.1999). An "adverse employment action" exists only where the plaintiff endures a "materially adverse

change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997). To be "materially adverse", a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibility." *Crady v. Liberty National Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). See also Galabya v. New York City Board of Education, 202 F.3d 636 (2d Cir.2000).

The following cases illustrate job inconveniences that have been held not to constitute an "adverse employment decision," as a matter of law. *Wanamaker v. Columbian Rope Company,* 108 F.3d 462 (2d Cir.1997) (to refuse use of an office and telephone); *Leget v. Henderson,* No. 99 Civ. 3636, 99 Civ. 4610, 2001 WL 43615 (S.D.N.Y. Jan. 18, 2001) (a temporary transfer to another tour-shift); *Fridia v. Henderson,* No. 99 Civ. 10749 BSJ, 2000 WL 1772779 (S.D.N.Y. Nov. 30, 2000) (treating her poorly, assigning her excessive work and denying requests for leave with pay).

In this case, the cubicle move was not an adverse employment decision, as a matter of law.

### F. As to the Plaintiff's Salary Contention

■ Michael Schaeffer testified that he has no responsibility with regard to the plaintiff's salary. The plaintiff is in a classification called Project Engineer 1 and is a P–9. A P–10 is a Senior Project Engineer. The pay scale goes from P–1 to P–10. Schaeffer stated that "P–9 is generally the highest that an engineer is expected to rise in his career at Brookhaven National Laboratory. These are senior engineers or architects that are responsible for part or an entire project ... only the most senior, most talented, educated ... ever reach the P–10 level." (Tr. at 415).

Planning Manager DiNicola also testified about the plaintiff's salary. He stated that, in the year 2001, the minimum salary for a P 9 is $67,400 and the maximum is $100,500. DiNicola stated that he had no authority to set Yadav's salary outside the guidelines. In order to affect the plaintiff's salary, DiNicola would have to write a memorandum, and he has never done that.

It is interesting to note that the plaintiff's salary increased from $32,000 to $77,750 per year, including a $2500 raise on January 1, 2002. Also, with regard to the plaintiff's salary, as of October 1, 1999, seven Project Engineer I employees earned less than the plaintiff. As of January 1, 2002, four Project Engineer I employees were paid less than the plaintiff.

Edward Murphy is the Manager of Plant Engineering of BNL, the second in command of the Division. He explained the salary structure for a Project Engineer I. The plaintiff's salary was within the mandated range. Murphy stated that Project Coordinators, like Swapna Mukherji, although also in the P–9 category, were paid more because of their additional job responsibilities and their broader knowledge of engineering principles.

The Court finds that, although on the low side, plaintiff's salary is in the comparable range for P–9 employees. There is absolutely no evidence in this case that the plaintiff's salary was in any way diminished, because of his Indian national origin.

### G. As to the Plaintiff's Claim of Harassment and Humiliation

■ Master Planner DiNicola denied knowing of an incident in which the plaintiff contends he was "insulted" by Project Coordinator Richard Scheidet (Tr. at 486). Manager Thomas Timko also denied knowing about the "Scheidet" incident. In what manner the plaintiff was allegedly "insult-

ed" was not stated. DiNicola also denied that in the year 2002, referring to the plaintiff, one Peter Boyle "put him down" in front of two inspectors and someone from the Medical Department. (Tr. at 490).

The Court makes short shrift of the plaintiff's complaint that the memos from Timko to him say "Raj see me," rather than "Raj, *please* see me." In no way could this be construed as national origin discrimination, or even an attempt to humiliate the plaintiff.

The plaintiff testified as to various incidents in his working life at BNL which annoyed and irritated him. For example, he stated that "on a daily basis DiNicola tells me what to do" and he dislikes being "greeted like a little kid," but he has accepted this treatment. He also related disagreements and conflicts with Peter Boyle, Richard Scheidet and Constantini. The plaintiff stated that this conduct by his colleagues is "depressing, unfair and degrading." The plaintiff's concerns are understandable but have nothing to do with national origin discrimination. Similarly, his complaint that Constantini, the person under his supervision, avoids doing anything for him. This is regrettable but again, is not evidence of national origin discrimination. The plaintiff complains that Schaeffer addressed him in an "angry tone" and raised his voice to him. Again, perhaps regrettable, but not national origin discrimination. Stray remarks, although nasty and hurtful, are not actionable unless motivated by discriminatory content. Here, the Court finds no such discriminatory intent or motivation.

The plaintiff summarized his concerns by relating his belief that the only reason he can think of for these occurrences happening to him is that he is an Indian. The Court attempted to explain to the plaintiff the vagaries of an at-will employment in the face of difficulties caused by supervisors and fellow employees:

> THE COURT: What you've told us about feeling you are not a supervisor is regrettable but may not be subject to liability under Section 1981 because employers can do anything they want to an employee as long as it's not motivated by a discriminatory factor. They can be mean, they can be nasty, they can do anything under the law, except under federal law they can't do it because of a discriminatory motivation. It's as simple as that.
>
> People have labored under very difficult conditions for years and years of time. Everybody has experienced this, but it's not actionable in a federal court, certainly, unless it's motivated by discrimination.
>
> So look at your complaint. There are allegations in there that are relevant. If you want to bring them out, do that.

Tr. at 720.

In this regard, the Court also takes note that in the BNL Bulletin of May 21, 1999, the plaintiff's daughter Rani Yadav, as a high school senior, was awarded a BSA Director's Scholarship. She will receive $2,500 per year for up to four years of study at the college or university of her choice.

### III. *CONCLUSION*

As stated in a case with an interesting title, *This is Me, Inc. v. Elizabeth Taylor*, 157 F.3d 139, 142 (2d Cir.1998):

> A district court may not grant a motion for a judgment as a matter if law unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Cruz v. Local Union No. 3, Int'l Bhd. Of Elec.*

*Workers,* 34 F.3d 1148 1154–55 (2d Cir. 1994) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)) (internal quotations marks omitted). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that "a reasonable juror would have been compelled to accept the view of the moving party." *Piesco,* 12 F.3d at 343.

Drawing all reasonable inferences in favor of the plaintiff and making all credibility assessments in his favor, no rational juror could find in the plaintiff's favor on any material issue in this case. The plaintiff has failed to prove any intent on the part of the defendants to discriminate against him on the basis of his race or Indian national origin. The plaintiff has failed to prove that any adverse employment decision suffered by him, including the failure to be promoted to manager of MSIP and his salary concerns, were in any way motivated by his race or Indian national origin.

Accordingly, the motion by the defendants at the conclusion of the case, pursuant to Rule 50, for a judgment as a matter of law dismissing the complaint, is granted. In so doing, the Court also denies the defendants' motion for summary judgment pursuant to Rule 56. The complaint is dismissed and the Clerk of the Court is directed to enter judgment in favor of the defendants.

**SO ORDERED.**

